## MORAND BROS. BEVERAGE CO. v. NATIONAL LABOR RELATIONS BOARD.

### No. 10335.

United States Court of Appeals, Seventh Circuit.

July 23, 1951.

------◆------

Samuel L. Golan, Chester F. McNamara, Leonard W. Golan, all of Chicago, Ill., Golan & Golan, Chicago, Ill., of counsel, for petitioners.

David P. Findling, A. Norman Somers and Bernard Dunau, N. L. R. B., all of Washington, D. C., George J. Bott, General Counsel, Benjamin A. Theeman, Attys., National Labor Relations Board, Washington, D. C., for respondent.

George O. Bahrs, San Francisco, Cal., Arthur C. Rooney, Chicago, Ill., Eli E. Dorsey, Seattle, Wash., Robert P. Patterson, New York City, Marshall A. Pipin, Chicago, Ill., Seago, Pipin, Bradley & Vetter, Chicago, Ill., of counsel, amicus curiae.

Gerard D. Reilly, Washington, D. C., Reilly, Rhetts & Ruckelshaus, Washington, D. C., Doesburg, Goddess & Bowes, Chicago, Ill., of counsel, for Union Employers Section Printing Industry of America, Inc., amicus curiae.

William R. Bowes, S. G. Lippman, Chicago, Ill., Herbert Thatcher, Albert Woll, Washington, D. C., Woll, Glenn & Thatcher, Washington, D. C., Robert Karmel, Chicago, Ill., of counsel, amici curiae.

Before KERNER, LINDLEY, and SWAIM, Circuit Judges.

LINDLEY, Circuit Judge.

Petitioners, wholesale dealers and distributors of alcoholic beverages, seek to set aside an order of the National Labor Relations Board requiring them to cease and desist from discouraging membership in Liquor and Wine Salesmen's Union, Local 62, "by discharging (their employees) or otherwise discriminating in regard to their tenure of employment" or from interfering with, restraining or coercing them in any other manner in the exercise of the rights guaranteed by Section 7 of the National Labor Relations Act, 29 U.S. C.A. 157. The order also directs petitioners to make back pay awards to their employees.

All of petitioners are members of either the Illinois Wholesale Liquor Dealers Association or the Chicago Wholesale Liquor Dealers Association. Since 1942, they have recognized Local 62 as the exclusive collective bargaining representative of all their salemen-employees and have, from time to time, entered into collective bargaining agreements with that union governing the salesmen's terms and conditions of employment. Thus, contract negotiations were conducted annually between representatives of the employer associations, acting on behalf of petitioners, and representatives of the Union, acting for the salesmen. Once a proposed contract was agreed upon, it was submitted for majority approval to the membership of the Associations and the Union and, their respective approvals having been obtained, separate and identical contracts were executed by the Union and each of petitioners.

Early in January, 1949, negotiations for a new contract were begun, and, by January 22, an apparent impasse had been reached on the question of an increase in commissions for the salesmen. Since the 1948 contract was to expire at the end of January, 1949, the Associations and the Union executed an interim agreement extending the life of the expiring contract to March 15, 1949, "to allow the parties additional time within which to adjust outstanding differences growing out of the negotiations for a successor contract," but the stalemate over commissions continued throughout the extension period. On March 16, the Union sent directly to each petitioner a copy of a document entitled "second supplemental agreement," together

with a letter stating that it was "imperative" that the agreement, which included the increase in commissions demanded by the Union, be executed without further delay. The Illinois Association responded in a letter expressing surprise that the Union had "mailed out the contracts without having previously reached an agreement" with the Association's Labor Committee and stating that its members "must decline to execute these agreements." To this letter the Union did not reply, and the then existing status persisted until late in March, 1949, when the Union, to which all of petitioners' salesmen belonged, unanimously approved a general strike authorization.

Rumors of the proposed strike led petitioners, at a meeting held about April 1, to prepare a letter in blank, a copy of which was to be sent to each of their salesmen in the event a strike should be put in force against any one or more of petitioners. The letter read as follows:
"Dear * * *.

Since the existence of the salesmen's union, all contracts have been negotiated and signed on an industry-wide basis. During the negotiations last year and this year, we exhibited financial statements prepared by certified public accountants to the Union officials which demonstrated our inability to give any increase in the commission rate. The Union officials agreed that we were unable to give an increase last year and, accordingly, the contract was signed without changing the commission rate.

Business conditions certainly cannot be any better in 1949 than in 1948, and it would be sheer folly and economic disaster on our part to grant the salesmen any increase in their present high commission rate. During our negotiations this year, the Union officials admitted that if the commission rate was increased, a large number of wholesalers would have to go out of business, nevertheless, the salesmen's union has called their men off the job and are now picketing * * *.

A strike against one house or small group of houses is not just a strike against one individual wholesaler, but it is a strike against our house and all the other wholesalers in Chicago. If we permitted the Union to do this, it would merely be a question of time until each house would be compelled to sign this unfair contract or to close its business doors; we consider this action by the Union to be in the same category as a strike called against all of the wholesalers. The Union officials have been advised and are fully aware of our position and since the salesmen of your Union walked out on one of these houses it is our position that you have decided to strike every wholesaler who has been a party to the industry-wide negotiations.

Accordingly, we ask you to turn over to us immediately any records, papers, credentials or monies that you may have belonging to us, and come and see us immediately so that we may settle any financial differences that exist to date between us.

Very truly yours,"
Signed copies of this letter were prepared on the stationery of the respective individual petitioners and delivered to the Illinois Association, with the understanding that the names of the various salesmen and the name of the struck petitioner would be filled in and the letters mailed, in the event of a strike. The Union was informed of the existence of these letters during the second of two unsuccessful meetings, held on April 2 and 4, between representatives of the Associations and the Union.

On April 5, the Union wrote each petitioner, except the Old Rose Distributing Co., a letter stating that it had "no intention of calling a stoppage of work at your establishment" and that "it would be erroneous to interpret * * * action (taken against any other establishment) as a threat of a strike in your establishment." Late the next day, the Union struck against Old Rose, and picketing began early on the morning of April 7. On that morning the president of Old Rose, Frank, telephoned O'Neill, president of the Union, asking what was to be done about the strike, to which O'Neill replied that he was ready "to sit down with you * * * and discuss a contract right now." This recorded

conversation was played back to a full meeting of the Associations that afternoon, at which the Illinois Association was authorized to fill in and send out the letters-in-blank theretofore prepared by the petitioners. Copies were mailed to each salesman of each petitioner, including Old Rose. On April 8, many of petitioners' salesmen, having received these letters, did not report for work; some of those who did report were told they were "fired" and sent home; others were requested to work that day and then sent home. In any event, none of petitioners' liquor salesmen was employed as such after that date. Many were paid the commissions earned up to April 7 (their commissions were customarily paid on a quarterly basis) and some were requested by petitioners to turn in all "monies and property belonging to us which are now in your possession." By April 11, picket lines had been extended to the establishments of several of petitioners in addition to Old Rose, the pickets carrying placards which read, "Locked out and discharged." However, on or about May 1, the terms of a new contract having been agreed upon between the Union and the Associations, the strike ended and all salesmen returned to work. On May 4, the Board's General Counsel, acting upon a charge and supplemental charge filed by the Union prior to the settlement of the dispute, issued against petitioners herein an unfair labor practices complaint charging them with the discriminatory discharge of all their salesmen-employees. This complaint was heard at Chicago on June 14, 15 and 17, 1949.

The Trial Examiner found that "the employees of Old Rose were discharged on or about April 8 and the employees of the other Respondents were locked out because of the action of the local in striking Old Rose," that such action constituted "discrimination on the part of each Respondent against its employees," that "no legal justification has been shown for the discriminatory treatment of the employees involved," and that petitioners' action violated Sections 8(a)(1) and 8(a)(3) of the Act, 29 U.S.C.A. § 158(a)(1, 3). He recommended that petitioners be ordered to cease and desist from discouraging their employees' union membership "by discharging or locking them out or otherwise discriminating in regard to their tenure of employment" and that they "make whole" each of their employees via a back pay award.

The Board, in its decision, after reciting that it "hereby adopts the findings, conclusions, and recommendations of the Trial Examiner, with the following additions and modifications: * * * We find that the Respondents discharged their salesmen on or about April 8, 1949 * * *," went on to state: "We find, therefore, *in agreement with the Trial Examiner,* and in accordance with the position of the General Counsel, that all the Respondents * * * *discharged* their salesmen, in violation of Section 8(a)(1) and (3) of the Act."[1] (Emphasis Supplied.) The Board's order closely followed the recommendations of the Trial Examiner with the exception that in paragraph 1(a) thereof, the words "or locking them out" were stricken from the phrase "by discharging or locking them out or otherwise discriminating in regard to their tenure of employment," as it appeared in the Trial Examiner's recommendations.

Petitioners urge that the Board erred in finding they had discharged their salesmen and had engaged in unfair labor practices in violation of the Act, alleging that such findings are not supported by substantial evidence on the record considered as a whole. They also contend that the Union was itself guilty of violations of Sections 8(b)(1)(B) and 8(b)(3) and, hence, not entitled to the Act's protection, and that the Board should have so found. Finally, they assert that, under the circumstances obtaining in this case, the inclusion in the Board's order of a back pay award was erroneous, in that such an award tends to defeat rather than effectuate the policies of the Act.

---

1. The Trial Examiner's finding was that Old Rose's employees had been *discharged* and the employees of the other petitioners *locked out.*

Petitioners' argument that the Union is not, under the facts of this case, entitled to the protection of the Act is premised on its postulate that the Union had violated Sections 8(b)(3) and 8(b)(1)(B) of the Act, which provide that it shall be an unfair labor practice for a labor organization or its agents to refuse to bargain collectively with an employer or to restrain or coerce an employer in the selection of his representative for the purposes of collective bargaining, by mailing to each of the petitioners individually a copy of the Union's proposed "second supplemental agreement," together with a letter stating that it was imperative that the agreement be executed, and by the strike at Old Rose, followed by a Union offer to discuss a contract with its president. These acts, petitioners say, constituted a refusal to bargain collectively with an employer, i. e., the employer associations of which petitioners were members, as well as the coercion of an employer, i. e., each petitioner in its individual capacity as an employer, and, especially, Old Rose, in the selection of a bargaining representative. The Board, however, although holding that it was the duty of the Union in the first instance to bargain with the Associations, held that the association-wide unit was not the only appropriate unit for collective bargaining purposes and that, once an impasse had been reached in negotiations between the Union and the Associations, the Union had a right to institute separate negotiations with single employers.

■ With respect to the Union's submission of its proposed contract to the individual petitioners, after negotiations with the Associations' Labor Committees had been stalemated, we believe that, in view of the fact that past contracts, although negotiated by the Associations, had been signed by petitioners individually and the fact that each petitioner was free at any time to withdraw from the association to which it belonged and bargain on its own behalf, see Section 8(b)(4)(A) of the Act, this cannot be said to have been an unfair labor practice. Certainly, the fact that *identical* contracts were sent to the entire membership of the Associations, though perhaps indicative of a Union belief that

the Associations' members might be less adamant than their Labor Committees had been, is hardly consistent with a refusal, on the part of the Union, to continue bargaining on an association-wide basis. Moreover, the Supreme Court's condonation, in National Labor Relations Board v. Crompton Mills, 337 U.S. 217, 224–225, 69 S.Ct. 960, 93 L.Ed. 1320, of certain Board decisions to the effect that an employer's unilateral grant of a wage increase previously offered to and rejected by the union is not an unfair labor practice would seem to indicate that, conversely, the Union's submission, to the individual members of the Associations, of a proposal which had been submitted to and rejected by the Associations would not be violative of the Act. And, finally, to construe such action as a refusal to bargain with the Associations would be to ignore the fact that the Union did continue to meet with Associations' representatives, at least two such meetings occurring between the date of the mailing of the proposed contracts and the strike against Old Rose.

■ The strike itself, if undertaken for the purpose of forcing Old Rose to select a different bargaining representative, would have been clearly violative of Section 8(b)(1)(B) of the Act. Both the Trial Examiner and the Board found that it was an economic strike, the Trial Examiner stating that the Union's motive was to force Old Rose to sign the so-called second supplemental agreement and the Board finding that "the Old Rose Strike was called, not because of any objections by the Local to dealing with the negotiators for the Associations, but solely because of the inability of the Local to obtain a satisfactory contract through joint bargaining." That petitioners themselves so regarded the strike is evident from the following statement, which appears in the form letters mailed to the salesmen on the day following the strike: "A strike against one house or small group of houses is not just a strike against one individual wholesaler, but it is a strike against our house and all the other wholesalers in Chicago." We think the finding that the strike against Old Rose was an economic strike is sup-

ported by the evidence, when we consider the record as a whole. Therefore, it was not unlawful but rather a "concerted activity" within the meaning and protection of the Act. International Union of Automobile Workers v. O'Brien, 339 U.S. 454, 456–457, 70 S.Ct. 781, 94 L.Ed. 978. Nor does the fact that the Union's president offered to "discuss a contract" with Old Rose's president require a different conclusion. It must be remembered that this statement was made in the course of a telephone conversation inaugurated by the president of Old Rose and in response to his question "Well, then, what am I supposed to do, Joe, I mean talking frankly, if they (the other members of the Associations) don't (lock out their salesmen)?" It seems to us that, under these circumstances, the statement cannot be said to have been threatening or coercive or indicative of any unwillingness on the part of the Union to bargain further with the Associations, whether as the representative of Old Rose individually or as the representative of all their members collectively.[2] Consequently, although we do not indorse the Board's reasoning to the effect that, once negotiations have been stalemated, a union may utterly disregard the employer unit with which it has theretofore bargained and proceed to fashion a new unit for bargaining purposes, we do approve its conclusion that the Union here did not violate Sections 8(b)(1)(B) or 8(b)(3) of the Act.

 Concluding, then, that the Union, unable to agree with the Associations upon a satisfactory contract, had a right to strike against Old Rose, or, for that matter,

any or all of the Associations' members, it becomes important to determine what retaliatory measures were available to petitioners.[3] Old Rose, of course, had a clear right to replace its striking employees. National Labor Relations Board v. Mackay Co., 304 U.S. 333, 345, 58 S.Ct. 904, 82 L.Ed. 1381. The other petitioners, we believe, could quite properly and realistically view the strike, as they did, as a strike which, though tactically against but one petitioner, was, in the strategic sense, a strike against the entire membership of their Associations, aimed at compelling all of them ultimately to accept the contract terms demanded by the Union. It follows that they had a right to counter the strike's effectiveness by laying off, suspending or locking out their salesmen, who were members of the striking Union and as to whom there was not then in effect any collective bargaining agreement.[4] We so hold, not merely on the basis of the implied recognition, in the 1947 Amendment to the Act, Section 8(d)(4), of the existence of such a right, but because the lockout should be recognized for what it actually is, i. e., the employer's means of exerting economic pressure on the union, a corollary of the union's right to strike. Consequently, once petitioners had exhausted the possibilities of good faith collective bargaining with the Union through their Associations, any or all of them were free to exercise their right to lock out their salesmen without waiting for a strike, just as the Union was free to call a strike against any or all of them.

 In the instant case, however, the Board found that petitioners had not merely

---

2. If Old Rose's president had been told that the Union would not discuss a settlement with him but would meet only with the Associations, it might well be contended that the Union had violated Section 8(b)(3) by refusing "to bargain collectively with an employer" who could not, under the terms of the Act, Section 8(b)(4)(A), be forced to designate an employer association as his bargaining representative and who, having joined such an association, was free to withdraw from it at any time.

3. It is in this aspect of the case that the amici curiae, who are, for the most part, employer associations confronted with the common problems of multiemployer bargaining, have expressed the greatest interest.

4. We are not unaware that the Board has taken a contrary position in the Davis Furniture Co. case, 94 NLRB No. 52, where it held that a strike against a single employer of a multiemployer unit did not justify the lockout of their employees by Association employers whose stores were not struck.

laid off or locked out but had discharged their employees. Although petitioners strenuously assert that this finding lacks substantial evidentiary support, they contend, in the alternative, that they had a right to discharge their employees when the Union struck Old Rose. With the latter contention we cannot agree; although it would seem that petitioners should be accorded the right to counter such a strike with a lockout, i. e., that they have a right to meet economic pressure exerted by the Union with economic pressure exerted on the Union, it is clearly settled that an employer's discharge of his employees because of their union affiliations or activities, strike activity included, is an unfair labor practice, violative of Section 8(a)(3) of the Act. National Labor Relations Board v. Jones & Laughlin, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893; Phelps Dodge Corp. v. Labor Board, 313 U.S. 177, 183, 61 S.Ct. 845, 85 L.Ed. 1271; International Union of Automobile Workers v. O'Brien, 339 U.S. 454, 456–457, 70 S.Ct. 781, 94 L.Ed. 978. Consequently, it becomes crucially necessary to determine whether the finding that petitioners discharged their employees is supported by substantial evidence on the record considered as a whole.

The pivotal circumstance in the determination of whether petitioners locked out, laid off, suspended or discharged their employees is the letter of April 7, mailed to the employees by the Illinois Association on petitioners' behalf. Although counsel for the Board have repeatedly referred to it as a discharge letter, the letter itself is, at best, ambiguous, and its real meaning has been a matter of serious controversy between petitioners and the Union. A number of salesmen testified that they interpreted the letter as a notice of discharge and, consequently, did not report for work after receiving it; others who, not yet having received the letter, reported for work on April 8 testified that they were told they were "fired." On the other hand, supporting petitioners' contention that the letters were notices of a layoff rather than a discharge are the significant facts that none of the salesmen was replaced and all were subsequently reinstated, facts which are hardly consistent with the view that the letters accomplished a complete severance of the employer-employee relation between the various petitioners and their respective salesmen.

The Trial Examiner, who heard all the testimony, found, as trier of the facts, that, whereas the employees of Old Rose were "discharged," the employees of the other petitioners were "locked out." [5] He made no finding that the lockout was intended to sever permanently their employment by petitioners; nor did he indicate that he was using the terms "discharge" and "locked out" interchangeably or as synonyms. The Board, however, apparently construed his finding that petitioners' employees had been locked out as equivalent to a finding that they had been permanently discharged, for it stated: "We find * * *, *in agreement with the Trial Examiner,* * * * that all the Respondents on or about April 8, 1949, *discharged* their salesmen * * *." (Emphasis supplied.) Thus, on the crucial question whether, as the Trial Examiner found, petitioners' employees were merely locked out (in which case petitioners, other than Old Rose, would not, we think, have been guilty of an unfair labor practice) or whether they were discharged (in which case the contrary result would obtain), the record is not at all clear. It is true that the Board's brief and argument would indicate that the Board did mean to find that there had been a discharge, as distinguished from a lockout, but, even so, there is, in the record itself, nothing to indicate why the Board concluded, if it did so conclude, that the Examiner's find-

5. The Trial Examiner apparently felt that Old Rose could not be said to have merely laid off or locked out its salesmen, who were already out on strike when the letters addressed to them were placed in the mail. Although petitioners have stated that those letters were mailed through a clerical error, it seems to us that the distinction drawn by the Trial Examiner cannot be said to lack substantial support in the evidence.

ing that petitioners' salesmen had been locked out was equivalent to a finding that they had been absolutely discharged or on what evidence it relied in reversing, if it did reverse, the Examiner's express finding on this point and, thus, nothing on which this court can base a determination of the propriety of the Board's action or the substantiality of the evidence on which it was based. Consequently, we conclude that the case should be remanded to the Board, with directions that it make a clear and explicit finding on the question whether the severance of the employer-employee relation between the various petitioners (other than Old Rose) and their respective salesmen was intended to be temporary or permanent and, if intended to be temporary in character, in view of the Board's further consideration, whether it was made for the purpose of "interfering or coercing employees in the rights guaranteed to them by Section 7" or as a legitimate exercise of petitioners' economic remedies; and, if permanent, whether, in the light of the principles announced in this opinion, a back pay award would tend to effectuate the policies of the Act.

 With respect to the Old Rose Distributing Co., the Board's request for enforcement of its order must be granted; insofar as all other petitioners are concerned, the cause is remanded to the Board for further proceedings in conformity with the decision of this court.