**MORAND BROS. BEVERAGE CO. et al. v. NATIONAL LABOR RELATIONS BOARD.**

No. 10727.

United States Court of Appeals Seventh Circuit.

May 28, 1953.

Samuel L. Golan, Chester F. McNamara and Leonard W. Golan, Chicago, Ill. (Go-

lan & Golan, Chicago, Ill., of counsel), for petitioner.

S. G. Lippman, Fred F. Herzog and Robert Karmel, Chicago, Ill., for amicus curiae.

David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Bernard Dunau, Atty., National Labor Relations Board, Washington, D. C., George J. Bott, Gen. Counsel, Mary E. Williamson, Washington, D. C., for respondent.

Before DUFFY, LINDLEY and SWAIM, Circuit Judges.

LINDLEY, Circuit Judge.

This controversy makes a second appearance before us. See, Morand Bros. Beverage Co. v. N. L. R. B., 7 Cir., 190 F.2d 576. Therefore, reference is made to the prior decision for a detailed statement of the facts leading eventually to the contested issue.

The cause is again presented on the cross petitions of Morand Brothers et al. (herein referred to as petitioners) and the National Labor Relations Board (herein referred to as the Board) seeking, respectively, to set aside and to enforce the order of the Board that petitioners cease and desist from discouraging membership in the Liquor and Wine Salesmen's Union, Local 62, "by discharging [their employees] or otherwise discriminating in regard to their tenure of employment" and from interfering with, restraining or coercing them in any other manner in the exercise of the rights guaranteed by section 7 of the National Labor Relations Act, as amended, 29 U.S.C.A. § 157.

Certain salient facts may justify some repetition. Petitioners are members of either the Illinois Wholesale Liquor Dealers Association or the Chicago Wholesale Liquor Dealers Association. Since 1942 the members have individually and collectively recognized Local 62 as the exclusive bargaining representative of all their salesmen. Collective bargaining has been carried on since that time by the Union on the one hand and the representatives of the associations, on the other, with final individual employer approval of contracts depending upon a majority vote of the members of the associations.

Early in 1949 negotiations were initiated with the purpose of reaching an accord which would have replaced the then operative contract, due to expire at the end of January 1949. Agreement was impossible. On January 22, an impasse had been reached. Consequently, a short term interim contract was executed, scheduled to expire March 15. The parties passed this deadline without a new contract, still at an impasse.

Late in March the Union approved a general strike authorization, news of which quickly reached petitioners. A joint meeting of the associations was held about April 1 at which time the letter quoted in our former opinion, 190 F.2d at 579, was drafted. Each employer was to send a copy of this letter, written on his own stationery, to each employee, in the event a strike was put in force against any number less than all, of the petitioners.

On April 6 the Union struck at Old Rose Distributing Company. Picketing began the next day. Petitioners immediately mailed the letter to the respective employees. Many salesmen did not report to work after receipt of the letter. Those who did were told they could not work. The picketing spread, creating the impression of general strike conditions until, on or about May 1, a new contract was negotiated, the strike ended, and all salesmen (save one) returned to work. On May 4 the General Counsel of the Board issued an unfair labor practices complaint, based upon the Union's charge and supplement thereto, alleging that petitioners had discriminatorily discharged all of their salesmen-employees. The Board concluded that the allegations of the complaint had been proved and, consequently, issued a cease and desist order identical to the one involved here. Cross petitions for review and enforcement were addressed to this court.

In the course of our prior opinion we said [190 F.2d 582]: "* * * petitioners, we believe, could quite properly and realistically view the strike, as they did, as a

strike which, though tactically against but one petitioner, was, in the strategic sense, a strike against the entire membership of their Associations, aimed at compelling all of them ultimately to accept the contract terms demanded by the Union. It follows that they had a right to counter the strike's effectiveness by laying off, suspending or locking out their salesmen, who were members of the striking Union and as to whom there was not then in effect any collective bargaining agreement. We so hold, * * because the lockout should be recognized for what it actually is, i. e., the employer's means of exerting economic pressure on the union, a corollary of the union's right to strike. Consequently, once petitioners had exhausted the possibilities of good faith collective bargaining with the Union through their Associations, any or all of them were free to exercise their right to lock out their salesmen without waiting for a strike, just as the Union was free to call a strike against any or all of them." We added, however, "It is clearly settled that an employer's discharge of his employees because of their union affiliations or activities, strike activity included, is an unfair labor practice, violative of Section 8(a)(3) of the Act. [Citing cases.] Consequently it becomes crucially necessary to determine whether the finding that petitioners discharged their employees is supported by substantial evidence on the record considered as a whole."

We then turned to the record but found it "not at all clear" on the crucial question whether, " * * * petitioners' employees were merely locked out * * * or * * * were discharged." The confusion was the result of the Trial Examiner finding a "lockout" while the Board said it was "in agreement with Trial Examiner * * * that all of the Respondents * * * discharged their salesmen." This was a patent inconsistency which could be resolved only by the Board. Consequently, the cause was remanded "with directions that [the Board] make a clear and explicit finding on the question whether the severance of the employer-employee relation * * * was intended to be temporary or permanent and, if intended to be temporary * * * whether it was made for the purpose of 'interfering or coercing employees in the [exercise of] the rights guaranteed them by section 7' or as a legitimate exercise of petitioners' economic remedies; * * *." Reconsideration of the back pay award was also ordered.

Pursuant to the remand order, and a subsequent order authorizing the taking of additional evidence, further hearings were held. The Trial Examiner found, with respect to the intended duration of the severance, that it was "to cover the period of disagreement; and that when the dispute was over, each Petitioner expected, or at least hoped, to reinstate all its old salesmen. * * * [I]t was not a permanent severance." However, he found on the second issue that the temporary severance was "intended to interfere with the [lawful] concerted activity of the salesmen * * * in the exercise of rights guaranteed under section 7 * * * and was not a legitimate exercise of Petitioners' economic remedies." This, because there was no evidence of economic justification "because of disruption in operation, to prevent spoilage of merchandise or other operative hardships. * * * [T]he men were released because their union struck Old Rose, and in anticipation that one or more of the other houses might also be struck."

The Board took the Examiner's findings under advisement. Having accepted his "resolutions of the credibility of witnesses", its members were unanimously "persuaded that the evidence preponderates in favor of a finding * * * [of] a permanent *discharge* and not a temporary layoff." Thus, on the first issue the Examiner was reversed. Four of the members (Chairman Herzog not joining) then assumed, *arguendo,* that the severance was intended to be only temporary. Here they affirmed the Trial Examiner because "we find no evidence * * * which would indicate the purpose of the severance * * * was to obviate difficulties in the operation of the petitioners' businesses likely to result from the anticipated strike * * *. [Furthermore] on the record as a whole, we find that the purpose of the severance * * * was to punish the employees for the Old Rose strike * * * in order to persuade

the employees of the folly of the action taken by their Union; to cause disaffection from the Union, and thereby to destroy that Union."

These findings adequately complied with the directions of this court. But, the four members who had answered issue two, apparently felt constrained to voice their disapproval of our concept that, following a bargaining impasse the employer may engage in a lockout, it being his corollary of the employees' right to strike. We are told that our opinion "has a kind of superficial appeal, an aura of fairness" which on "more careful examination of the implications of this argument discloses its inherent defects."

■ Before considering the question of the substantiality of the evidence in support of the Board's findings of fact, which is, of course, the only question properly presented at this stage of these proceedings, we think it not unwise to recall a basic tenet in our federal system of administrative practice and review. The position of any administrative tribunal whose hearings, findings, conclusions and orders are subject to direct judicial review, is much akin to that of a United States District Court. Federal Communications Commission v. Pottsville Broadcasting Co., 309 U.S. 134, 140, 60 S.Ct. 437, 84 L.Ed. 656. That is to say, it is the "inferior" tribunal, whose decisions, both substantive and, in some instances, adjective, are subject to review and consequent approval or disapproval by the reviewing body. The full implication of this relationship is realized when, as here, the occasion arises for the reviewing court to state what it believes to be the substantive law applicable to a particular controversy but finds that the lower tribunal has not conclusively found the facts to which this law should be applied. The result then, in view of the rule that a reviewing court shall not enter initial findings of fact, is an order remanding the cause "for further proceedings in conformity with the decision of this court." The pronouncements of the reviewing court are then known in the vernacular as "the law of the case", i. e., they are the rules to govern the particular dispute at hand, unless, of course, the decision of the reviewing court is declared erroneous by a tribunal of competent jurisdiction holding a still more superior position in the judicial pyramid. In such a situation it behooves the inferior arbiter to exercise great care that "the law of the case" is applied to the facts of the case when they have been precisely determined by it. This is so even when it finds itself in well founded disagreement with its reviewer.

There is a most salutary reason for our adherence to this doctrine. While we must take care that improper or ill-conceived decisions be held to a minimum, and, when they appear, be quick to supplant them with sound decisions, we must remember that the particular lawsuit must, at sometime, come to an end. It is conceivable, though admittedly highly improbable, that an individual piece of litigation could be bounced up and down endlessly, from trial to appellate court, merely because of the refusal of the lower body to apply the law as announced by the reviewing one. In short, experience has taught that causes are disposed of most expeditiously when the correction of errors is left to the superior tribunals and those enjoying judicial or administrative inferiority studiously endeavor to comply with the mandate issued to them.

The application of these principles was neglected in three instances upon remand of these proceedings to the Board. The most obvious and most troublesome is the express disapproval of our prior opinion by four members of the Board.[1] This position was abandoned by the General Counsel in his

---

1. The "implications" which the four members thought revealed "inherent defects" in our concept of the propriety of a lockout under these circumstances were exemplified by them in several hypothetical examples. They stated: "Under this view * * * an employer may lock out his employees at any time as a retaliatory measure against any conduct of his employees, concerted or otherwise, which is detrimental to his interests. This would mean that an employer would be privileged to lock out his employees in order to defeat their organizational activ-

brief and argument before this court. Nevertheless its presence in the record implies an attitude on the part of these members to have their ultimate judgment that petitioners had engaged in unfair labor practices recognized in any event. This is an unwholesome outlook which not only fails to take cognizance of the mentioned principles of our administrative-judicial system but ignores the fact that the interpretation and application of the Act is vested not only in the Board but also the Courts of Appeals and the Supreme Court. It serves no purpose other than to impinge upon the respect which deliberations of the Board are customarily accorded.

The two other instances to which we have referred are contained in the Examiner's and Board's findings of fact on the second issue presented by our remand. Both found that the intention behind a temporary severance was to coerce and interfere because there was (in the language of the Board) "no evidence * * * [of] difficulties in the operation of Petitioners' business," which we construe to encompass the Examiners bases, i. e., that there was no proof of "disruption in operation", "to prevent spoilage of merchandise or other operative hardships." These employer anticipations have previously been recognized by the Board as justification for a lockout. See, Link Belt Co., 26 N.L.R.B. 227; International Shoe Co., 93 N.L.R.B. No. 159; Duluth Bottling Association, 48 N.L.R.B. 1335; Brown-McClaren Co., 34 N.L.R.B. 984; Betts Cadillac Olds, Inc., 96 N.L.R.B. No. 46. However, to that list our opinion added another: present a bargaining impasse, the lockout would be justified as the assertion of the employer's corollary to the Union's right to strike, absent, of course,

affirmative proof of unlawful intent. In other words, in view of the bargaining impasse here, it did not follow from a negation of the existence of previously recognized justifications for a lockout, that petitioners' intentions were unlawful.

We come then to a consideration of the issues drawn by the cross petitioners for review and enforcement: Are the findings of fact of the Board supported by adequate evidence on the record considered as a whole? Although two issues of fact were presented to the Board, both of which it resolved against petitioners, if either finding is adequately supported by the evidence that ends the matter. That is the further import of our prior decision.

We find the Examiner and the Board in disagreement as to the first issue, the former concluding that the action taken by petitioners which culminated in the letter of April 7 (and in some instances April 8) was intended to effectuate a temporary severance or lay off, the latter the opposite result: a permanent severance.

Thus we have presented a situation somewhat similar to that confronting the Supreme Court in Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. The Act provides: "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive. * * *" 29 U.S.C. 160(e). In Universal Camera, the court considered the scope of our review with respect to questions of fact in view of this statutory language, and in addition what effect, if any, findings by the Trial Examiner, contrary to those of the Board, have on the substantiality of the evidence "considered as a whole".

ities, to assist a company-dominated union, to punish them for past strike activity, to discourage them from joining a union, to force withdrawal of bargaining demands even before an impasse is reached, or for any other reason. Thus, it is clear that we could not unqualifiedly equate lockouts with strikes without giving the employer a license to engage in conduct which the Board and the courts have heretofore uniformly considered to violate * * * the Act."

The fair import of our prior decision was made clear when the court said: "Consequently, once petitioners had exhausted the possibilities of good faith collective bargaining * * * any or all of them were free to exercise their right to lock out their salesmen without waiting for a strike * * *." It is difficult to see how these members of the Board concluded this language implied the right to lock out "before an impasse is reached."

We were told there that we "must" review the record as a whole "to satisfy [ourselves] that the Board's order rests on adequate proof." By the term of the statute the proof, in order to be adequate, must consist of "substantial evidence." This is more than a scintilla. It can be likened to proof sufficient "to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." N. L. R. B. v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660. However, in applying this test we look not only to the Board's proof but "must take into account whatever in the record fairly detracts from its weight." 340 U.S. at page 488, 71 S.Ct. at page 464. Having so viewed the record, if we "cannot conscientiously find that the evidence supporting that decision is substantial" we are "not barred from setting aside [the] Board decision". Id. Turning to the position of the Trial Examiner's contrary findings of fact, the court concluded that his findings need not be "clearly erroneous" in order that the Board overrule them. However, they most certainly are a part of the record which we considered as a whole, with their significance depending "largely on the importance of credibility in the particular case". 340 U.S. at pages 493, 496, 71 S.Ct. at page 469.

These, then, are the factors involved in our review. Courts of Appeals were told that they "must * * * assume more responsibility for the reasonableness and fairness of Labor Board decisions" taking care "not to abdicate the conventional judicial function." 340 U.S. at page 490, 71 S.Ct. at page 466. This we had attempted to do prior to Universal Camera, see, A. E. Staley Mfg. Co. v. N. L. R. B., 7 Cir., 117 F.2d 868, and subsequent thereto. See, Whiting Corp. v. N. L. R. B., 7 Cir., 200 F.2d 43. However, the assumption of that responsibility includes an awareness that we are still a court of review—not a finder of facts —and consequently, must recognize the expert qualities of the Board in its proper realm and "even as to matters not requiring expertise * * * may [not] displace the Board's choice between two fairly conflicting views" because we have not the matter before us "*de novo*". 340 U.S. at page 488, 71 S.Ct. at page 465.

We have read the entire record of these proceedings, as indeed we must to view it properly as a whole, and have concluded that the Board's finding that petitioners intended to sever permanently the employer-employee relationship at the time the April 7 letter was delivered to their employees is supported by adequate substantial evidence and consequently provides a sufficient basis for the cease and desist order entered.

A word might first be said about words. Throughout the proceedings the parties have attempted to characterize the action taken by petitioners as a mass "discharge" implying permanent severance, or a "layoff" or "lockout" intimating a temporary severance. Were these terms used exclusively perhaps our task would be easier. But "locked out and discharged" "legally discharged", "temporarily laid off", "permanently laid off", "fired" "dismissed" and "suspended" have also been resorted to, with a resultant symbolic confusion. Was not the issue this: When the employer action was taken was it intended that, upon the cessation of the strike, the salesmen would be automatically reinstated or that it would be necessary for them to reapply for reemployment? The former is lawful conduct, absent other improper motive or intent; the latter unlawful. As we read the Board's decision, it concluded that at the time the action was taken the latter was intended and hence petitioners had violated the Act.

The Board noted that the April 7 letter directed the salesmen to turn in any records, papers, credentials and moneys belonging to petitioners. Considerable testimony of record attests that such a direction is employed in the trade only when the employer-employee relationship is permanently severed; that the ill or vacationing salesman does not turn in his materials during his absence but that the man discharged for dishonesty or a poor sales record does.

Certain witnesses testified that prior to April 7 they were told, while in attendance at a sales meeting, that, in event of a strike

they would be "fired". Others stated that upon reporting for work after April 7, they were told they had been discharged. Still others recounted that their quarterly adjustment between commissions earned and weekly draw was made prematurely. Allen Schultz, formerly general counsel of the Chicago Association, testified that the purpose, in demanding the return of the books and records, was to "receive * * * anything that had to do with establishing a relation between the employer and the employee"; that "the plan [was] not having a lockout but a discharge"; a "legal discharge"; that "the thought of the organization was that maybe you could do as you pleased after the strike was over, take them back or not take them back"; "We thought at that time that a lockout would be illegal, but that a discharge—we have a right to hire and fire our help—that would be legal."

Against this was petitioners' evidence. The following circumstances were shown: (1) all of the salesmen, save one, were reemployed after the strike; (2) petitioners continued to pay health insurance premiums and union trust fund contributions for their severed salesmen; (3) several petitioners loaned substantial sums of money to their severed salesmen; (4) few salesmen sought other work; (5) petitioners did not seek replacements for their severed salesmen; (6) relatives of petitioners, employed as salesmen, were treated the same as other severed salesmen; (7) a letter of April 27 sent to the severed salesmen stated that they would "be back" after the strike was settled; (8) friendly relations continued to exist between petitioners and the severed salesmen.

Robert Ackerberg, Regional Attorney for the Board, testified that petitioners' counsel discussed the April 7 letter with him prior to its mailing and that counsel was desirous of avoiding the commission of an unfair labor practice. Michael Wayne, an officer of one of petitioners and a witness for the Board, testified "we [petitioners] intended to take them back when it was over." Added to all of this was the Examiner's finding of fact that the severance was intended to be temporary not permanent.

The Board considered much of petitioners' circumstantial evidence in detail. It noted, with respect to the failure to attempt to hire replacements, that it would have been difficult to offer any replacement job security and that all petitioners were operating under the same handicap. It called attention to the facts that: the training of a salesman was somewhat extensive, as was the good will of the individual salesmen, thus offering an alternative explanation for the total reemployment; petitioners were under a contractual duty to pay into the Union trust fund certain money for all employees on the payroll as of the fifth of each month; of the total number of salesmen to testify, the percentage of those who sought other employment was relatively high; the letter of April 27 was an after-the-fact declaration; in addition to the friendly relations between some petitioners and their employees there were displays of animosity.

The Board recited that it had made a careful study of the evidence including the Trial Examiner's findings. It accepted his resolutions as to credibility. However, we may note that no express resolutions were offered by the Examiner,—only those which might be deemed implicit in his findings. The Board was of the opinion that the evidence preponderated in favor of a finding of permanent discharge, inspired by an intent to interfere with the employee's selection of a bargaining agent. It so found and entered its order accordingly.

This review of the record is somewhat sketchy. However, we observe that it correctly displays a sharp dispute as to the facts,—a dispute which the Board has resolved against petitioners. While we might, upon consideration of the record *de novo,* reach a contrary result, we are not prepared to say that the evidence relied upon by the Board, together with the reasonable inferences available therefrom, was not substantial and adequate; were the trial to a jury we could not direct a verdict for petitioners. N. L. R. B. v. Columbian Enameling Co., supra. Therefore, the finding of the Board is "conclusive" and should not be set aside.

■ The question of the back pay award "is a broad discretionary one, * * * for the Board * * * not for the courts." N. L. R. B. v. Seven-Up Bottling Co. of Miami, 344 U.S. 344, 346, 73 S.Ct. 287, 289. Such an order must stand in the absence of a showing of a patent attempt to achieve ends other than those which fairly effectuate the policies of the Act. Ib.

Judgment will enter enforcing the order.