**AMERICAN BRAKE SHOE COMPANY**
(Ramapo Ajax Division), Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD,** Respondent.

No. 11858.

United States Court of Appeals
Seventh Circuit.

May 6, 1957.

George B. Christensen, Chicago, Ill., Fred H. Daugherty, David C. Keegan,

Chicago, Ill., for petitioner, Winston, Strawn, Smith & Patterson, Chicago, Ill., of counsel.

Marcel Mallet-Prevost, Asst. General Counsel, N. L. R. B., Washington, D. C., Kenneth C. McGuiness, Gen. Counsel, Stephen Leonard, Assoc. Gen. Counsel, Norton J. Come, Alice Andrews, Attys., National Labor Relations Board, Washington, D. C., for respondent.

Before DUFFY, Chief Judge, and LINDLEY and SWAIM, Circuit Judges.

LINDLEY, Circuit Judge.

Petitioner seeks to set aside an order of the National Labor Relations Board wherein it was found to have violated §§ 8(a) (1), (3), and (5) of the National Labor Relations Act. 29 U.S.C.A. § 158. The conduct of which complaint was made was the layoff of employees resulting from the gradual tapering off of production by petitioner, looking to cessation of operations contemporaneously with the expiration of an existing collective bargaining agreement. The Board found that these actions necessarily discouraged union membership, interfered with protected employee rights within the purview of § 7 of the Act, 29 U.S.C.A. § 157, and aborted the bargaining process.

Petitioner operates several plants, including the one in question in East St. Louis, Illinois, where it is engaged in the manufacture, distribution, and sale of railroad equipment such as frogs, switches, and switch stands. It does not manufacture stock in trade, but, rather, produces items on special orders from its customers. The products are not freely interchangeable among the various railroads, but are built to order. Due to climatic conditions, most railroad repair work is done in the spring and summer months. Consequently, it is necessary that production and delivery of such equipment be strictly timed.

At this plant, some 90 people are employed, who are represented by several bargaining units, including the International Brotherhood of Electrical Workers (hereinafter referred to as I.B.E.W.), and International Association of Machinists (hereinafter referred to as the I.A.M.). I.B.E.W. represents 3 employees and I.A.M. 54. In December, 1953, petitioner had separate contracts with each union, which were to expire February 28, 1954. Petitioner had maintained contractual relations with the two unions for some 9 or 10 years.

In the years preceding 1954, the plant had been involved in two major strike situations with I.A.M., the first occurring in 1948, lasting for 6 months, and the second, in 1951, tying up operations for 4 months. In addition, in February 1953, I.A.M. conducted a 10-month strike against another of petitioner's plants located just across the river in St. Louis, Missouri. From the record it is clear that the two strikes had a decidedly adverse effect on petitioner's customer relations, as orders scheduled to be filled were strike bound in the plant, causing a delay in deliveries and a threat of permanent loss of business. Several railroad companies complained that unless assurances of prompt delivery in the future were given, they would be obliged to transfer their business to other competing manufacturers. In addition, one important customer threatened that this was petitioner's "last chance."

In December 1953, I.A.M. notified petitioner and, thereafter, the Federal Mediation Service and the Illinois State Department of Labor, as required by Section 8(d) of the Act, that it was desirous of terminating the current agreement upon its expiration and offered to negotiate a renewal contract in conformity with suggested changes which accompanied the notice. At the first bargaining session, promptly arranged by petitioner for January 5, 1954, the changes advocated were discussed. They were quite extensive in character. Thus, among other demands, I.A.M. sought a 40 cents an hour wage increase, a union shop, dues checkoff, adoption of the Union's welfare plan, additional overtime pay, and double time for holidays. Some of these matters had been in issue in the prior strikes. At this meeting, petitioner, aside from offering to consider

the checkoff provision, offered to renew the existing contract. However, at that time, Mr. Clohesy, petitioner's personnel manager and principal negotiator, stated emphatically that the previous strikes had so affected customer relations that it was imperative that negotiations be concluded as speedily as possible in order that the company might safely schedule operations in the plant. He added that no work could be scheduled on any orders which could not be completed by the time the contract was to expire, unless a new agreement could be negotiated. At the next meeting, on January 19th, I.A.M. reduced its wage increase demand to 25 cents an hour and withdrew its double time request. Petitioner adhered to its original position and suggested that its proposals be submitted to the Union's members. At the conclusion, Mr. Clohesy reported to the company's president that it looked doubtful whether the parties would reach a new agreement by the expiration date.

During the latter part of January, petitioner reviewed its pending orders and began to assign to others of its plants orders which could not be delivered from East St. Louis by the time the current contract ended. Due to this transfer of orders to other points, by February 1st, the East St. Louis plant began to run short of work and petitioner began to lay off employees.

At a meeting on February 8th, which was attended by a conciliator, I.A.M. dropped its demand for a union shop as well as the welfare fund issue. After reviewing the positions of the parties, the conciliator informed petitioner's representatives that the only real issue in dispute between the parties seemed to be that relating to wages and that if the company had an offer to make, the opportune time had arrived to submit its proposal. However, the employer refused so to act unless I.A.M. would give assurance that a contract would be signed, if an agreement was reached. Mr. Hamilton, I.A.M.'s representative, agreed. Mr. Clohesy thereupon offered a 4½ cent raise across the board, which

the union said would be satisfactory to the production workers but not to the journeymen machinists, as it would leave them relatively lower in the area wage scale generally established by I.A.M., and thus place the union at a disadvantage when bargaining at other places of employment within the area. Nevertheless, Hamilton agreed to submit petitioner's offer to the employees. Once again, petitioner reiterated its position that it did not want to be caught with unfilled orders in the shop as it had been on past occasions, and that, as a result, it was unwilling to commence work it could not complete.

On February 18th, the members of I.A.M. voted to accept petitioner's offer of a 4½ cent raise across the board. However, when Hamilton learned on February 25th that the plant was to be shut down, he informed petitioner that the employees had voted to accept its proposals but that the Union had refused to approve the contract. On February 26th, petitioner laid off all its employees for the announced reason that, as the parties had not arrived at a new contract, production could not continue without assurance of uninterrupted operation. On the day of the shutdown, the employer sought to obtain a signed statement from three of the four members of I.A.M.'s negotiating committee of a no strike assurance, but the committee refused to reduce such an assurance to writing although they stated that the employees would continue to work. A mere oral assurance was unsatisfactory to the company.

At a meeting on March 3rd, the I.A.M. members voted to rescind their action of February 18th whereby they had agreed to accept petitioner's offer, and directed that the company be notified that its offer was acceptable as to production workers, but that negotiations should continue as to the rate for journeymen. Nevertheless, because of the possibility of work interruptions, the company refused to resume scheduling work, but repeated its original offer. Finally, on March 26th, a contract was

signed. In the negotiations with I.B. E.W., pursuant to the union's demand for different contract terms, petitioner informed I.B.E.W. as it had I.A.M., that it desired merely a renewal of the present contract, and that, if an agreement with I.A.M. was not reached by the time of expiration of the contract period, it would be forced to close its plant.

It is the contention of the Board that, by announcing that the plant would not continue in operation, because of the possibility of interrupted production, by tapering off the work load of the plant and by the subsequent layoffs, petitioner interfered with the rights guaranteed to the employees under Section 7 of the Act, namely, the right to bargain collectively and to engage in other concerted activity. In addition, it is urged that this course of conduct constituted discriminatory treatment within the meaning of Section 8(a) (3), and represented a refusal to bargain in good faith in violation of Section 8(a) (5).

Before discussing the crucial problems before us, it is necessary to dispose of a problem sensitive in its nature. The trial examiner found that petitioner did not adopt its position for the purpose of exerting economic pressure on the bargaining position of the unions. And, as we understand the position of the Board, it does not contend to the contrary. Rather, it admits that the layoff was motivated solely by foreseeable operative and economic difficulties as a result of its apprehension of a possible strike. Therefore, we are not faced with the rather vexing problem of determining under the circumstances here presented, whether a shutdown by an employer for the purpose of exerting bargaining pressure is a corollary of the employees' admittedly protected right to strike. See Morand Bros. Beverage Co. v. N. L. R. B., 7 Cir., 190 F.2d 576; Id., 7 Cir., 204 F.2d 529; Leonard v. N. L. R. B., 9 Cir., 197 F.2d 435; Id., 9 Cir., 205 F.2d 355. This identical question was specifically reserved by the Supreme Court in its recent decision in N. L. R. B. v. Truck Drivers Local Union No.

449, 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676.

Thus, we are confronted with the problem of determining whether, under the circumstances of this case, the findings of the Board are supported by substantial evidence. The Board concluded, contrary to the findings of the trial examiner, that, speaking objectively, the company was not faced with a real threat of strike. In addition, it held that, even though there was a substantial strike threat, nevertheless, the operational problems confronting petitioner were not sufficient to justify its action.

■■ Business or economic reasons have been held not to justify restraint or discrimination on the part of the employer. Republic Aviation Corp. v. N. L. R. B., 324 U.S. 793, 65 S.Ct. 982, 89 L. Ed. 1372; Allis-Chalmers Mfg. Co. v. N. L. R. B., 7 Cir., 162 F.2d 435, 440; N. L. R. B. v. National Broadcasting Co., 2 Cir., 150 F.2d 895, 900. And, there can be no dispute but that the right to engage in a lawful strike is a protected concerted activity within the meaning of Section 7 of the Act. Amalgamated Ass'n, etc. v. Wisconsin Employment Relations Board, 340 U.S. 383, 389, 71 S. Ct. 359, 95 L.Ed. 364; International Union of United Automobile, etc., Workers of America, C. I. O. v. O'Brien, 339 U.S. 454, 456–457, 70 S.Ct. 781, 94 L. Ed. 978. However, as has been observed by the Board, the rights of the employees to engage in collective bargaining and to strike in furtherance of their economic demands must be balanced against the employer's right to protect his business against loss. N. L. R. B. v. Babcock and Wilcox Co., 351 U. S. 105, 112, 76 S.Ct. 679, 100 L.Ed. 975; Republican Aviation Co. v. N. L. R. B., supra. Indeed, the Board has held in a series of cases that, where unusual economic hardships or operative conditions are found to exist, an employer faced with a threatened or actual strike may take certain protective measures. Thus, in Duluth Bottling Assoc., 48 N.L.R.B. 1335, the Board decided that an employer may close down operations where a

spoilage of materials would otherwise result. And, in International Shoe Co., 93 N.L.R.B. 907, similar action was allowed where a prospective work stoppage in one of several integrated departments threatened to become recurrent so that it would have been difficult for the employer to plan production. In Betts Cadillac Olds, Inc., 96 N.L.R.B. 268, the Board concluded that the Union's refusal to give assurances of sufficient advance notice to allow repair work in progress to be finished and returned to customers rendered it economically imprudent for the employer to continue operations. At page 285, the Board has this to say: "While the right of common law lockout may not be the equivalent of the right to strike at all—a question not decided at this point—it does not follow that the employer caught in strike activity must be a sitting duck, stripped of his power to save himself from attendant loss or operative disruption. He has, and needs, the right to protect himself by reasonable measures from harmful economic or operative consequences of a strike. * * * While he may not close down for the purpose of frustrating the exercise of the employees' statutorily guaranteed rights, he may do so to protect his legitimate interests." The Board elaborated upon the elements of the problem with which we are confronted (page 286): "An employer is not prohibited from taking reasonable measures, including closing down his plant, where such measures are, under the circumstances, necessary for the avoidance of economic loss or business disruption attendant upon a strike. *This right may, under some circumstances, embrace the curtailment of operations before the precise moment the strike has occurred. The pedestrian need not wait to be struck before leaping for the curb.* The nature of the measures taken, the objective, the timing, the reality of the strike threat, the nature and extent of the anticipated disruption, and the degree of resultant restriction on the effectiveness of the concerted activity, are all matters to be weighed in determining the reasonableness under the circumstances, and the ultimate legality, of the employer's action." (Emphasis supplied.)

Thus, we are relegated to an examination of the criteria set forth in Betts Cadillac Olds, Inc., supra, and we must determine, in light of these postulates, whether the findings of the Board meet the requirement of substantiality. The first problem is whether, from past and existing circumstances, petitioner was reasonably justified in fearing a strike on the part of I.A.M.; and, if it was so justified, whether the particular economic and operational hardships were of sufficient moment to legalize the company's defensive tactic of an operational shutdown.

From the evidence adduced, the trial examiner concluded that there were sufficient objective factors from which a reasonable person could and would assume that a real strike threat existed. The Board in effect overruled this finding. In considering the correctness of this conclusion, we must bear in mind the admonition of Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 496, 71 S.Ct. 456, 469, 95 L.Ed. 456, where the Court elaborated on the problem confronting a reviewing court when the findings of the Board and the trial examiner conflict: "We do not require that the examiner's findings be given more weight than in reason and in the light of judicial experience they deserve. The 'substantial evidence' standard is not modified in any way when the Board and its examiner disagree. We intend only to recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion. The findings of the examiner are to be considered along with the consistency and inherent probability of testimony. The significance of his report, of course, depends largely on the importance of credibility in the particular case." Upon a review of the record we

are of the opinion that the conclusion of the Board on this issue, can not be sustained, and that the trial examiner was correct in determining, from the past conduct of the union, the nature of its demands, and the refusal to give any written assurances, that petitioner was reasonably justified in anticipating that a real strike threat existed.

We turn to the question of whether there were sufficient economic and operational problems foreseeable to warrant petitioner's voluntary curtailment of production. Without attempting to delineate the extremities of these elements, which give rise to the right of an employer to reduce the effectiveness of a real or threatened strike, we recognize that the determination involves the striking of a balance between the employees' guaranteed right to strike and the employer's right to prevent resulting economic hardship. We agree with the trial examiner that this employer, faced with the problematical business losses which would accrue as a result of a strike bound shop, was completely justified in slowing up orders in the productive process and ultimately closing the doors of its plant. As previously pointed out, the equipment produced was primarily made to order with specific delivery dates. From prior strike experience, petitioner was well aware of what would happen to its customer relations in the event that orders were not filled on time. There is substantial evidence to support the conclusion that there would indeed be an irreparable loss directly attributable to the work then in process, and that permanent loss of business would result. This was made only too clear when this employer was informed by the railroads that unless prompt delivery could be guaranteed they would have to purchase equipment elsewhere. In addition, there is the testimony to the effect that one of the company's most important customers announced that this was petitioner's "last chance." This case is much more than merely one of depreciating inventory or of disappointment to customers, as noted in Truck

Drivers Local Union No. 449, etc. v. N. L. R. B., 2 Cir., 231 F.2d 110, 114, reversed 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed. 2d 676. We conclude that the imminent probability of a permanent loss of business was sufficient justification for petitioner's defensive action within the purview of the doctrine established by the Board in Betts Cadillac Olds, Inc., 96 N.L.R.B. 268; International Shoe Co., 93 N.L.R.B. 907; Duluth Bottling Assoc., 48 N.L.R.B. 1335.

Having concluded that there was a reasonable threat of strike, that petitioner's actions in reducing its output were not designed to exert coercive bargaining pressure on the unions, and that there were sufficient economic and operative difficulties present to justify the employer's conduct as privileged protective measures, we hold that petitioner in no way violated its duty to bargain in good faith. An assertion to the contrary necessarily falls of its own weight, in view of the circumstances before us. In addition, it is clear from the record that the company was affirmatively and honestly desirous of negotiating and reaching an agreement and preventing a shutdown.

In arriving at the conclusion that an unfair labor practice had been committed, the trial examiner found that, by closing down its plant after I.A.M. had filed the requisite notices under Section 8(d), petitioner had encroached upon § 8(a) (5). The Board, in its decision, did not pass on this particular theory. In a footnote it merely stated: "In view of our decision herein, we do not reach and therefore do not determine whether, in laying off its employees and shutting down, the Respondent (petitioner herein) failed to comply with the requirements of § 8(d) of the Act and thereby violated § 8(a) (5)." In our view this did not constitute a reservation of the point by the Board. Furthermore, the question of the applicability of § 8(d) was not urged on review. If, as is advocated, this case were remanded to the Board for a determination of the § 8(d) issue, this action would merely

give the Board another bite at the proverbial cherry, and, if such conduct were condoned, piecemeal litigation would result. Consequently, the request for remand is denied, and the order of the Board is vacated and set aside.