221 F.2d 427
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
CONTINENTAL BAKING COMPANY; Dolly Madison Cake Company, a Division of Interstate Bakeries Corporation; P. F. Petersen Baking Company; Quaker Baking Company; Schulze Baking Company, a Division of Interstate Bakeries Corporation; Omaha-Council Bluffs Bakery Employers Labor Council; Cottage Donuts, Incorporated, Respondents.
 No. 15114.
 United States Court of Appeals Eighth Circuit.
 April 13, 1955.
 
 Duane B. Beeson, Atty., N.L.R.B., Washington, D. C., (George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Bernard Dunau, Atty., N.L.R.B., Washington, D. C., were with him on the brief), for petitioner.
 Harry R. Henatsch, Omaha, Neb. (Ralph E. Svoboda and Kennedy, Holland, DeLacy & Svoboda, Omaha, Neb., were with him on the brief), for respondents.
 David D. Weinberg, Omaha, Neb., submitted brief amicus curiae of International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Bakery Drivers Union, Local No. 204, A.F.L., and Bakery and Confectionery Workers International Union of America, Local No. 215, A.F.L.
 Before GARDNER, Chief Judge, and COLLET and VAN OOSTERHOUT, Circuit Judges.
 VAN OOSTERHOUT, Circuit Judge.
 
 
 1
 Pursuant to the provisions of Title 29 U.S.C.A. § 160(e), the National Labor Relations Board has petitioned this court for the enforcement of its order dated April 15, 1953, which is reported at 104 N.L.R.B. 99, against Continental Baking Company; Dolly Madison Cake Company, a Division of Interstate Bakeries Corporation; P. F. Petersen Baking Company; Quaker Baking Company; Schulze Baking Company, a Division of Interstate Bakeries Corporation; Omaha-Council Bluffs Bakery Employers Labor Council; and Cottage Donuts, Incorporated. The individual cases against respondents were consolidated for trial before the trial examiner and the Board, and the Board's petition here is for enforcement of its order against all respondents. The alleged violation occurred in this circuit. The proceedings below were conducted pursuant to the provisions of the National Labor Relations Act, as amended, 29 U.S.C.A. § 141 et seq., hereinafter called the Act. The Board found that respondents had violated section 8(a) (1) and (3) of the Act by locking out their employees. Summarized, the Board's order as to which it is seeking enforcement requires respondents to cease and desist from discouraging membership in the Bakers Union or any other labor organization by locking out their employees, or from in any other manner abridging the exercise by their employees of their guaranteed rights. Affirmatively, the Board's order requires respondents to make whole each of their employees for the discrimination against them by reason of the lockout, and to post appropriate notices.
 
 
 2
 Much of the evidence is undisputed. A good deal of it is stipulated. A fair summary is found in the report of the trial examiner. All of the respondents except Dolly Madison, whose case will be treated separately later, produce and sell bakery goods in the Omaha-Council Bluffs area. They do a considerable business, much of which is in interstate commerce. All except Dolly Madison are members of the Omaha-Council Bluffs Bakery Employers Labor Council hereinafter called the Employers Council. For over a decade the Employers Council has handled all negotiations with the employees of the members of the Employers Council, and uniform contracts were entered into by each council member and the unions. The unions involved are the Bakers Union whose members produce the product, and the Teamsters Union whose members deliver the product. The difficulty giving rise to this litigation grew out of negotiations and disputes between the Employers Council and the Bakers Union.
 
 
 3
 The contracts between the members of the Employers Council and the Bakers Union by their terms expired on April 29, 1951, but remained in effect during negotiations, subject to right of cancellation by either party. Negotiations were commenced for a new contract between the Employers Council and the Bakers Union in March of 1951. The Bakers Union submitted a list of 18 demands, one of which was for a 40-hour, 5-day workweek. The joint negotiations continued, and on September 5, 1951, the Bakers Union offered the Employers Council, through a federal mediator and subject to the approval of its membership, a package proposal of several economic concessions by the employers along with an option of granting either a checkoff clause or the 5-day week. The Employers Council accepted the offer and exercised the option in favor of the checkoff. The Bakers Union bargaining committee agreed to recommend that the package proposal be approved by the union membership. At a union meeting on September 8, however, the membership rejected the proposed agreement. A union member employed at the Omar bakery led the opposition to the proposal upon the ground that it did not provide for a 5-day week, which the Omar employees strongly favored. The minutes of the Bakers Union meeting on September 8, 1951, show the following proceeding:
 
 
 4
 "At [this] time the question was raised in view of the fact that the proposal of the employers had been rejected and that we had probably went as far as we can go in a peaceful manner as to whether we should take a strike vote and if so on what date. After considerable discussion it was moved and seconded that we take a strike vote at our next regular meeting, or October 13. Motion carried."
 
 
 5
 Notices were thereafter posted at the plants of all Employers Council members that a meeting would be held by the Bakers Union on October 13 for the purpose of taking a strike vote. The minutes of the Bakers Union meeting on October 13 relative to the strike vote show:
 
 
 6
 "At this time Mr. Ralph Robbins was introduced & given the floor to make his remarks.
 
 
 7
 "His most important remark was their locals 100% support in whatever undertaking may be made.
 
 
 8
 "Motion we take a strike vote shop by shop at this time by secret ballot. Motion carried.
 
 
 9
 Quaker (10) Schulze (14) Cottage Donuts (3)
 Yes No Yes No Yes No
 7 3 5 9 3 0

 Continental (22) Peter Pan (44) Safeway (6)
 Yes No Yes No Yes No
 17 5 4 40 6 0

 Omar
 Yes No
 93 4

 Total — Yes — No
 7 3
 5 9
 3 0
 17 5
 4 40
 6 0
 93 4
 ___ __
 135 61
 
 
 10
 "Motion we take another strike vote —
 
 
 11
 Yes No (¾ majority is 120)
 134 26"
 
 
 12
 Peter Olson, an international vice-president of the Bakers Union, was sent to Omaha to represent the International. He attended a negotiations meeting between the Employers Council and the Bakers Union on October 20. The trial examiner's findings as to this meeting are:
 
 
 13
 "In a further attempt to reach an agreement another meeting was held on October 20 at 3 p. m., at a local hotel, between representatives of Respondent Counsel, the Bakers, and Reis. At this meeting, Olsen, on behalf of the Union, demanded that the `package' agreement arrived at on September 5 and rejected by the union membership should include three additional provisions, (1), a 5-day 40-hour guaranteed week on an optional basis (that is the contract to provide that employees at each bakery could determine whether they wished a 5-day week); (2) a mechanization clause; and (3) a 3-cent retroactive increase covering the period from August 26, 1950 to April 29, 1951, the date of the expiration of the contract. Of these, the demand for the 5-day week in some form continued to be the most important. Nelson gave it as his opinion that the dispute could be settled if these three additional demands were granted. Le Mar, the representative of Petersen, asked if this was an ultimatum, to which Olsen replied that it was, and that he had in his pocket strike sanction against all the plants but was issuing it only as to Omar at that time. The demand for an optional 5-day week was rejected by the Council on the grounds that, as pointed out by Robert Hoffman, chairman of the Council's negotiating committee and president of Omar, previous contracts had all been uniform and identical, and that the 5-day week at one or more plants but not at all would introduce a competitive element of a nature which the Council had been formed to eliminate.
 
 
 14
 "Olsen testified that at one time during the meeting of October 20, he informed Hoffman that the crux of the dispute was the necessity of a 5-day week at Omar and that he said to Hoffman: `Bob, your people (i. e., the Omar employees) are hot, and unless we do something about this 5-day week, we are going to have a strike in your plant.' At this time Olsen, according to his own testimony, again suggested that Respondents consider an optional 5-day week. Hoffman's account of this conversation is that Olsen told him that things were `pretty hot' and that plans were already made for picket lines.
 
 
 15
 "During this conversation, according to the uncontradicted testimony of Hoffman and others, Hoffman told Olsen that at a meeting of members of Council several days previously, which the record elsewhere shows was on October 16, the Council had decided that a strike against any of its members would be considered as a strike against all. Hoffman put it this way while testifying:
 
 
 16
 "`If a strike was initiated by Local 215, or, let's say, any local against a member of this Council during the course of bargaining, attempting to work out a contract, that we as a group of operators would construe that or consider that a strike against the entire group.'
 
 
 17
 When Hoffman mentioned this decision to Olsen, the latter, according to the former's testimony, said that he had so been informed but that the employees did not believe it. The conversation broke up with Hoffman urging Olsen to do everything he could to avoid a strike.
 
 
 18
 "At another point during the meeting of October 20, Conners, the representative of Schulze, in the presence of other representatives of the Council asked Olsen if he had strike permission for all the bakeries. The record is clear on this but it is in contradiction as to what Olsen replied. John Nelson, vice president of the Bakers and an employee of Omar, and Arne Hanson, a representative of Respondent Quaker's employees, testified that Olsen announced that he was `releasing strike sanction for the Omar employees' The testimony of Respondent's witnesses is that Olsen said that he had strike sanction against all the bakeries but was releasing it as to Omar alone `at this time.' On cross-examination Olsen testified similarly as to the substance of his statement.
 
 
 19
 "E. Cancellation of the Omar contract; the strike
 
 
 20
 "About 8 p. m. on October 20, when the meeting was in recess for dinner, Dickey, business representative of the Bakers, together with Weinberg, its attorney, approached Hoffman and handed him a written notice cancelling the Bakers' contract with Omar. Hoffman passed this around to the other employer representatives present and Connors asked Dickey what it meant, to which Dickey replied: `You will find out.' Within an hour or so a picket line was set up at the Omar plant. No picket line was established at any other plant."
 
 
 21
 The Employers Council met on the day following the Omar strike to determine its course of action. Initially the members of the Council decided that the bakeries which were not struck would produce goods for Omar and distribute them under Omar's label. This plan was abandoned, however, when upon inquiry the Council learned that the teamsters union local which represented the distribution drivers of the bakeries would refuse delivery of Omar products while its employees were on strike. Thereupon the Council decided that all the bakeries would lock out their employees until the contract dispute was settled. This decision was carried out the following day, when each member of the Council except Omar sent a written notice both to its production employees and its drivers that it considered the strike against Omar to be a strike against all of the members of the Employers Council, and that it was therefore "obliged to discontinue production * * * until further notice."
 
 
 22
 Negotiations continued between the Employers Council and the Bakers Union, culminating in an agreement on terms of a new contract on November 23, 1951. This new contract was uniform and applicable to all of the Council member bakeries and included many of the bakers' demands, including the 5-day week.
 
 
 23
 There were no labor difficulties between the Employers Council members and the Teamsters Union. It was stipulated:
 
 
 24
 "There was, accordingly, no dispute as to contract terms between the members of the Respondent Council and the Teamsters Union unsettled, and no strike or walkout of any character involving members of the Teamsters Union caused any disruption of relations between members of the Respondent Council and the Teamsters Union."
 
 The parties likewise stipulated:
 
 25
 "All bakery employees and all driver employees of the employer members of the Respondent Council, without distinction or discrimination, were immediately restored to their respective positions. At no time were the driver salesmen employees or the bakery workers of the respondent companies discharged."
 
 
 26
 The facts pertaining to the issues in controversy will be further developed hereinafter.
 
 
 27
 At the time this case was decided the Board was adhering to its previous decisions to the effect that a lockout of employees of other employers in a multi-employer bargaining unit after a strike had been called against one employer, unless to prevent economic losses as then defined, automatically constituted interference, restraint, and coercion in violation of the Act. As to this position the Board in its brief states:
 
 
 28
 "* * * Thus, the Board now reads the Act as permitting a lockout by the members of an employer association in a multi-employer bargaining unit where a strike instituted against one of them by the union representing their employees `necessarily carried with it an implicit threat of future action against any or all of the other members * * *.' 34 L.R.R.M. at 1355. Accordingly, the Board seeks enforcement of the instant case solely upon the basis of its findings that the Omar strike was designed `to remedy a local condition of employment' and did not justify an apprehension by the respondents that any of them would be the object of subsequent strike action with respect to the same subject matter."
 
 
 29
 In Buffalo Linen Supply Company et al. v. Truck Drivers Local Union No. 449, 109 N.L.R.B. No. 69, the Board states its position as follows:
 
 
 30
 "As pointed out by the Trial Examiner, the foregoing facts, mainly stipulated, present the case `largely in a vacuum.' From these facts, and in the absence of specific evidence showing that the strike was likely to spread to the nonstruck Employers, the Trial Examiner, by reliance upon certain prior Board decisions, inferred that the Employers who were not struck engaged in unlawful retaliatory conduct. However, in these circumstances, we think the more reasonable inference is that, although not specifically announced by the Union, the strike against the one employer necessarily carried with it an implicit threat of future strike action against any or all of the other members of the Association. For, the Union's action represents a similar technique of exerting economic pressure to atomize the employer solidarity which is the fundamental aim of the multi-employer bargaining relationship. The calculated purpose of maintaining a strike against one employer and threatening to strike others in the employer group at future times is to cause successive and individual employer capitulations. Therefore, and in the absence of any independent evidence of antiunion motivation, we find that the respondent's action in shutting their plants until termination of the strike at Frontier was defensive and privileged in nature, rather than retaliatory and unlawful."
 
 
 31
 See also Leonard et al. d/b/a Davis Furniture Co. v. N. L. R. B., 9 Cir., 197 F. 2d 435, 205 F.2d 355; Morand Bros. Beverage Co. v. N. L. R. B., 7 Cir., 190 F.2d 576, 204 F.2d 529. The cases last cited deal exhaustively and persuasively with the questions involved on this appeal, but inasmuch as the Board has now adopted the rule of said cases a detailed discussion of them appears unnecessary.
 
 
 32
 The law to be applied by the reviewing court is the law in its present form and not the law as it existed at the time of the decision appealed from. N. L. R. B. v. National Gas Co., 8 Cir., 215 F.2d 160.
 
 
 33
 As previously stated, in support of its decision, the Board now relies solely on its findings: (1) that the strike against Omar was designed to remedy a local condition of employment deemed objectionable only by Omar's employees, and that the employees were locked out for two reasons, to-wit, to exhibit their sympathetic support for Omar in its dispute with the bakers and to force the bakers to cease striking against Omar and also to cease seeking a clause establishing an optional and non-uniform workweek; and (2) that there is no justification for any inference other Council members feared that the strike action would be taken against them. The Board contends that because of the above findings it does not believe the facts in the present case are like those stated in the Davis or Morand cases. The Board's reference is to its own decisions in the above cases. In its decision, the Board then states: "If they were, however, we would reach the same decision, for the reasons there set forth."
 
 
 34
 The Board's findings of fact upon which it relies are contrary to those of the trial examiner who heard the evidence. The examiner, after reviewing the evidence, states:
 
 
 35
 "I conclude that it was part of the Bakers' strike tactics to strike Omar first in furtherance of its strike strategy, the object of which was to obtain a uniform 5-day week at all bakeries, and that the strike sanction against the other bakeries was ready to be invoked as the tactical situation developed. I further find that Respondent had reasonable grounds for believing that this was the case.
 
 
 36
 * * * * * *
 
 
 37
 "In the instant case, as in the Davis case, although it is alleged in the complaint there is no evidence of reprisal apart from the lockout itself, or that the shut down, whatever may have been its effect, was retaliatory in purpose. That is, there was not there and there is not here any evidence that the employer in locking out his employees was motivated in purpose by hostility to the union or by a desire to interfere with its organization. * * *"
 
 
 38
 The standard for reviewing the Board's decisions is prescribed by Title 29 U.S.C.A. § 160(e), as amended, as follows:
 
 
 39
 "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive."
 
 
 40
 Prior to the 1947 amendment, the statute provided:
 
 
 41
 "The findings of the Board as to the facts, if supported by evidence, shall be conclusive."
 
 
 42
 The legislative history relative to the change in language in the statute is fully discussed by the Supreme Court in Universal Camera Co. v. N. L. R. B., 340 U. S. 474, 71 S.Ct. 456, 465, 95 L.Ed. 456. In the course of the opinion the following standards for review of the Board's decisions are prescribed:
 
 
 43
 "* * * Congress has merely made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view.
 
 
 44
 * * * * * *
 
 
 45
 "We conclude, therefore, that the Administrative Procedure Act [5 U.S.C.A. § 1001 et seq.] and the Taft-Hartley Act direct that courts must now assume more responsibility for the reasonableness and fairness of Labor Board decisions than some courts have shown in the past. Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. Congress has imposed on them responsibility for assuring that the Board keeps within reasonable grounds. That responsibility is not less real because it is limited to enforcing the requirement that evidence appear substantial when viewed, on the record as a whole, by courts invested with the authority and enjoying the prestige of the Courts of Appeals. The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both."
 
 
 46
 The Universal Camera case also deals with the problem of the effect to be given to an inconsistency between the trial examiner's findings and the Board's findings. The Court of Appeals in that case 2 Cir., 179 F.2d 749 deemed itself bound by the Board's rejection of the trial examiner's findings. In reversing, the Supreme Court said, 340 U.S. at pages 496, 497, 71 S.Ct. at page 469:
 
 
 47
 "We do not require that the examiner's findings be given more weight than in reason and in the light of judicial experience they deserve. The `substantial evidence' standard is not modified in any way when the Board and its examiner disagree. We intend only to recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion. The findings of the examiner are to be considered along with the consistency and inherent probability of testimony. The significance of his report, of course, depends largely on the importance of credibility in the particular case. * * *
 
 
 48
 * * * * *
 
 
 49
 "We therefore remand the cause to the Court of Appeals. On reconsideration of the record it should accord the findings of the trial examiner the relevance that they reasonably command in answering the comprehensive question whether the evidence supporting the Board's order is substantial. But the court need not limit its reexamination of the case to the effect of that report on its decision. We leave it free to grant or deny enforcement as it thinks the principles expressed in this opinion dictate."
 
 
 50
 We now come to the crucial question in this case, namely whether there is substantial evidence upon the record considered as a whole to support the findings upon which the Board relies. The record is voluminous. We have examined it carefully and conclude that the Board's findings are not supported by substantial evidence.
 
 
 51
 Under the undisputed evidence, all controversies between the members of the Employers Council and the Union representing the employees had been for many years worked out by joint negotiations resulting in identical contracts between each Council member and the Union. Such joint negotiations were in progress at the time of the Omar strike. As previously related, at the October 20 meeting the Union's representatives, in addition to the rejected package proposition, were holding out for three additional concessions, one of which was the 5-day week. It is true that the impetus for the 5-day week came largely from Omar, although the evidence establishes that employees of three other members voted for the strike. While opinions were expressed at the October meeting that if the 5-day week was agreed to a settlement could be reached, no formal offer was made by the Union to withdraw its other demands. If the 5-day week were the only obstacle and Omar's employees were the only ones interested in it, it is difficult to see why the package proposal was voted down by the Union. Omar's employees did not have enough votes to defeat the proposal. It is contended by the Board that the Union strike vote was as to Omar alone. The Union minutes heretofore quoted do not so show. Notice of the strike meeting was posted at all plants, and members from all plants attended the Bakers Union strike meeting and voted. The final strike vote carried six to one.
 
 
 52
 There is considerable controversy as to the interpretation of Peter Olson's statements at the October meeting between the Council and the Union. The trial examiner's findings as to this are:
 
 
 53
 "Olsen stated to the Council's representatives that he had strike sanction for all the plants but was releasing it as to Omar at this time, clearly indicating, it seems to me, that it might be released as to the other plants if and when it was deemed advantageous. This would clearly be not only within the bounds of the authorization by the International on October 24, 1951, endorsing a strike at all the plants but in furtherance of its avowed nation-wide campaign to obtain the 5-day week. Olsen did not state in categorical terms that the other bakeries would not be struck. The negotiations which took place during the strike were conducted, as previously, with the Council, not with Omar alone, and were for the purpose of obtaining a uniform contract at all plants and not for the single purpose of settling the strike at Omar or obtaining a 5-day week at that plant alone. These negotiations were completely successful from the Bakers' viewpoint. * * *"
 
 
 54
 There was a sharp conflict as to Peter Olson's statements about strike authority. The trial examiner saw and heard the witnesses and his finding on this point is entitled to great weight. Olson himself testified in part: "Q. At that time do you recall being asked the question as follows, `Tell us, Mr. Olsen, whether you told the bakery operators at the meeting of October 20 that you had strike sanction against all of the bakeries' and do you recall giving this answer to the question, `We' meaning the executive board of the international, `can issue strike sanction against any of them, but we are only releasing it against Omar at this time'? Do you recall that question being asked and that answer being given by you? A. Yes, I do. That was in relation to the legality of the international executive board's action and the legality of the strike votes."
 
 
 55
 Olson also told the Employers Council that the strike vote had carried six to one. Some of the members of the Council had received from their employees information as to the plant by plant strike vote. There was considerable discussion and confusion about the effect of the strike vote and its legality. Nothing specifically was said by the Union officials at the various meetings with the Council members to indicate that the members other than Omar had nothing to fear in the way of a strike. On the contrary, when Mr. Hoffman, Omar's manager, was asked what happened when Dickey gave him the strike notice, he testified:
 
 
 56
 "Well, as Mr. Dickey said yesterday, he expressed his sorrow when he handed it to me, and I, of course, read it and passed it around to the other members of the operating group. There were some conversations, some that I didn't hear, I mean I couldn't understand, and some that I did. I recall Mr. Connors asking Mr. Dickey, `What does this mean,' and he said, `You will find out,' and that is about what the extent of what I heard was, as far as conversation is concerned. The union committee stood around there for a few minutes and left. That was it. That was the end of it."
 
 
 57
 It is stipulated that the International Executive Board of the Bakers Union took the following action:
 
 
 58
 "Endorsed strike permission for Local 215, Omaha, Nebraska, against Omar Bakery, P. F. Petersen, Schulze (Interstate), Continental, Safeway, Cottage Donuts, Quaker because of failure to conclude a satisfactory agreement. To be released by Vice-President Olsen if final adjustment efforts fail and he has determined that the Local Union is in full compliance with all federal and/or state regulations. 470 members involved. Endorsed October 24, 1951."
 
 
 59
 The foregoing stipulation is modified somewhat by the stipulation that the Union officers would testify that the foregoing action was taken solely for the purpose of making the locked out employees eligible for strike benefits. In any event, the foregoing stipulated record is very strong evidence to support respondents' contention that the October 13 strike vote was a vote against all Council members, as it would appear that the Union's strike vote would be a prerequisite to the International's approval thereof.
 
 
 60
 Upon the issue of whether members of the Employers Council had reasonable grounds to fear a strike against all was imminent, the actual undisclosed authority of Mr. Olson is not important, nor are the undisclosed intentions of the Union members decisive. The important question is what the members of the Employers Council could reasonably believe from the information disclosed to them. There is no evidence whatsoever in the record of any hostility between the Council members and the Union, and there is no independent evidence of antiunion motivation. The Council members were competitors and in the past had insisted upon uniform contracts with the Union and were continuing in good faith to insist upon uniform contracts. The stated purpose of the uniformity was to enable all employers to compete on the same basis so far as labor costs and conditions were concerned. In the Buffalo Linen Supply Company case, supra, the Board states that the strike by employees against one employer of a multi-employer bargaining unit constitutes a threat of strike action against the other employers, which threat per se constitutes the type of economic or operative problem at the plants of nonstruck employers which legally justifies their resort to a temporary lockout of employees.
 
 
 61
 Upon the whole record we find that there is no substantial evidence to support the finding that the Council members had no reasonable basis for fearing a strike against them. We feel that the trial examiner reached the only reasonable conclusion possible on these issues under the evidence, and find no justification for the reversal of his findings by the Board.
 
 
 62
 The respondents have also urged that their shutdown was economically motivated by their desire to prevent the loss of their products in the process of manufacture, which would be occasioned by a strike against them. In support of this contention they rely upon Betts Cadillac-Olds, Inc., 96 N.L.R.B. 268; International Shoe Company, 93 N.L.R.B. 907; and Duluth Bottling Association, 48 N.L.R.B. 1335. The trial examiner rejected this contention. As to this issue the Board states:
 
 
 63
 "The Respondents' principal contention before us, as it was before the Trial Examiner, is that the lockout was motivated by a desire to avoid threatened spoilage losses. In agreement with the Trial Examiner, we are convinced by the record that this asserted desire to avoid spoilage losses, like the alleged desire to defend against a strike which threatened all, was not the motivating reason for the lockout, but was an afterthought."
 
 In a footnote the Board observes:
 
 64
 "We do not adopt the Trial Examiner's findings that no spoilage would have occurred if a strike was unexpectedly called, or that in any event the spoilage could have been prevented by supervisors."
 
 
 65
 In Morand Bros. Beverage Co. v. N. L. R. B., 7 Cir., 204 F.2d 529, at page 533, after referring to the cases last above cited in which the Board has recognized potential economic loss as a justification for a lockout, the court states:
 
 
 66
 "* * * However, to that list our opinion added another: present a bargaining impasse, the lockout would be justified as the assertion of the employer's corollary to the Union's right to strike, absent, of course, affirmative proof of unlawful intent."
 
 
 67
 Since what has heretofore been said is determinative of the case, we do not deem it necessary to decide whether the Board's finding on the issue of probability of loss through spoilage has been sustained by substantial evidence.
 
 
 68
 We shall now consider the situation of the Teamsters Union members. Their duty was to deliver bakery products. It was stipulated that no labor dispute existed between the Council members and the Teamsters. They were temporarily laid off for the reason there was no work for them to do. The bakers were not producing any goods to deliver. A similar situation is considered in Local 50, Bakery & Confectionery Workers v. General Baking Co., D.C.S.D.N.Y., 97 F. Supp. 73. There the labor difficulty was between the Council members and the Teamsters. The action was brought by the inside employees who were laid off because there was no means of delivering any goods that they might produce. A summary judgment of dismissal was granted. On the question pertinent here the court said at page 74:
 
 
 69
 "It is well settled that `a lockout is an employer's withholding of work from his employees in order to gain a concession from them.' Labor arbitrators have so understood and applied the term and have frequently stated that the denial of work does not constitute a lockout absent a labor dispute between the parties."
 
 
 70
 Other authorities are cited to support the foregoing statement. What is said in the Local 50 case is applicable here, particularly in view of our finding that the lockout as to the Bakers was lawful. There was no lockout as to Teamsters. They were temporarily laid off because there were no products to deliver.
 
 
 71
 The Dolly Madison situation remains for consideration. Dolly Madison, a division of Interstate Bakeries Corporation, operates a bakery in Kansas City. Dolly Madison is not a member of the Employers Council, nor are its bakers represented by the local of the Union with which the Employers Council bargains. Its products are delivered in Omaha by members of the Omaha Teamsters Union employed by Dolly Madison. Dolly Madison had no interest in the bakers strike but had a contract with a separate local of the same International as the Omaha Bakers Union. This contract contained a struck goods clause which made it lawful for Dolly Madison's employees to strike if ordered to produce goods to be supplied to any baking plant where a labor dispute existed. Dolly Madison, because it felt it would be in violation of its Kansas City contract if it shipped to Omaha during the strike, terminated shipments to Omaha. Shortly thereafter, Dolly Madison was notified by its bakery employees union of the strike in Omaha, its attention was called to the struck clause provision in its contract, and its observance thereof was requested. Whether right or wrong in its interpretation of the struck clause in its contract, Dolly Madison, so far as the record shows, in good faith considered the temporary discontinuance of its Omaha deliveries desirable. There is absolutely nothing in the record to indicate that Dolly Madison discontinued the Omaha deliveries with any purpose of furthering any one's interest in the Omaha labor dispute. The law applicable to the other Teamsters is also applicable to those employed by Dolly Madison.
 
 
 72
 We conclude that under the rules announced in the Buffalo Linen Supply Co. case, the Morand Bros. Beverage Co. case, and the Leonard case, all previously cited, none of the respondents was guilty of violating section 8(a) (1) and (3) of the Act. Accordingly, the Board's petition for enforcement of its order is denied.