**BUILDING SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 32-J, AFL-CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 16950.**

United States Court of Appeals District of Columbia Circuit.

Argued Nov. 28, 1962.

Decided Jan. 24, 1963.

---

* Sitting by designation pursuant to Sec. 291 (a), Title 28, U.S.Code.

1. 12 D.C.Code § 201 (1961). And see 16 D.C.Code § 1501 (1961).

2. The trial judge also passed on the Rule 60(b) motion.

Mr. Peter P. Smith, III, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Mr. Peter Campbell Brown, New York City, was on the brief, for petitioner. Mr. William N. Farlie, Jr., Washington, D. C., also entered an appearance for petitioner.

Mr. Paul J. Spielberg, Attorney, National Labor Relations Board, with whom Messrs. Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Melvin Pollack, Atty., National Labor Relations Bd., were on the brief, for respondent.

Before BAZELON, Chief Judge, and WILBUR K. MILLER and WASHINGTON, Circuit Judges.

BAZELON, Chief Judge.

This appeal involves cross-petitions for review and enforcement of an order of the National Labor Relations Board holding that petitioner Union violated the "secondary boycott" provisions of the National Labor Relations Act, 73 Stat. 542, 29 U.S.C. § 158(b) (4) (i) and (ii) (B) (Supp. III, 1962) [1] and requiring it to desist.

Terminal Barber Shops, Inc., the alleged secondary employer, operates either directly or through a wholly-owned subsidiary six Manhattan barber and beauty shops, located at 120 Broadway, in the Empire State Building, the Time and Life Building, the Tishman Building, Grand Central Terminal, and the Estelle Wyler Beauty Salon.

Joseph Todaro, the alleged primary employer was employed by Terminal as a working manager and barber, first in its Tishman shop and later in the Time and Life shop. As a working manager

---

1. The pertinent provisions read as follows:

"(b) It shall be an unfair labor practice for a labor organization or its agents—

\* \* \* \* \*

"(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

\* \* \* \* \*

"(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees \* \* \*."

he supervised the operations of other employees in the shop, and worked as a barber when not engaged in such supervision.[2]

Prior to 1960, Terminal engaged independent contractors for cleaning the shops, under oral, month-to-month, fixed-fee contracts. Such cleaning included the washing and waxing of floors, polishing of mirrors and dusting of fixtures. This work was done at night, after the close of business, and was distinct from the incidental cleaning done during business hours by Terminal's shoe-shine, checking and "brush-boy" concessionaires. The shop managers inspected the night cleaning work each morning before opening time and reported unsatisfactory results to the responsible cleaning contractor either directly or through Terminal's General Manager Brown.

In 1960, Terminal cancelled the contracts of National House Cleaners, Inc. ("National") and Anchor Cleaning Company ("Anchor"), because of poor work and exorbitant prices. After two other contractors proved equally unsatisfactory, Todaro negotiated with Terminal and took over the cleaning himself under contracts similar to those of National and Anchor.

Whereas National and Anchor had used men belonging to the petitioner Union, the two replacements and Todaro were non-Union. In early March, during the course of Terminal's cancelling the contracts of National and Anchor, the petitioner Union began to protest that Terminal was depriving Union men of jobs by contracting with non-Union cleaners, and in the ensuing months attempted to persuade Terminal to resume the use of Union contractors. In a letter of August 11 to Terminal, the Union said it had heard that Terminal planned to use its own employees for the cleaning, and threatened to picket Terminal shops where Union men had been displaced. On September 6, Terminal replied that "a change has been made for economic reasons" and stated that cleaning employees "will be hired by a firm which is separate and distinct from our organization." The Union nevertheless began to picket Terminal at the Tishman shop on November 2, and the Broadway shop on November 14. The picketing continued until November 28 when the Union agreed, after Terminal had filed the present secondary boycott charges with the Board, to cease for the pendency of this case.

At the time of the proceedings before the Trial Examiner, Todaro was the working manager of the Time and Life shop. He was also engaged in cleaning the Time and Life, Empire State, Tishman and Grand Central shops[3] with a work force of two employees. The Examiner concluded that Todaro was an independent contractor for the cleaning operations and therefore the primary employer. He held the picketing illegal because an objective of the Union was to compel Terminal, the secondary employer, to cease doing business with Todaro and resume using Union cleaners, an objective proscribed by § 8(b) (4) (B) of the Act. The Board adopted without change the findings and conclusions of the Examiner.

■ The question we face in this appeal is whether the record supports the Board's determination that Terminal was an "other person" than Todaro, within the meaning of § 8(b) (4) (B) of the secondary boycott provisions of the Act, and therefore entitled to the rights of a neutral employer. We think not.

2. Like other barbers and manicurists in Terminal's Manhattan shops, he was a member of Local 760, Journeymen Barbers, Manicurists, Hairdressers and Cosmetologists International Union of America. As a barber he was paid at the rate fixed by that Union's collective bargaining contract with Terminal, and as working manager he received $25 a week extra to compensate him for loss of customers, commissions and tips when engaged in supervisory activities, and $10 a week extra for services as cashier of the Time and Life shop.

3. His contracts to clean the Wyler and Broadway shops had been cancelled for unsatisfactory work.

We rely solely on the facts found by the Trial Examiner and adopted by the Board. They clearly show that Todaro was no ordinary independent contractor. He wore "two hats," one as a regular employee of Terminal, the other as a contract cleaner of Terminal's shops. He did contract cleaning only for Terminal. The work was done exclusively on the premises of Terminal's shops. Todaro "operated the business from the Time and Life Shop, where he received business mail, often used Terminal shop funds to cash checks of cleaning employees, used Terminal employment application forms when interviewing and hiring [night cleaning] employees, and procured business insurance through the Terminal insurance broker." It was Todaro who had negotiated cleaning contracts on behalf of Terminal with the two unsuccessful contractors who preceded him. Part of Todaro's job as shop manager was to inspect the night cleaning and thus "his control and supervision of the cleaning employees overlapped with his managerial duties, at least in his own shop." Moreover, the following excerpts from the Intermediate Report show that Todaro did not have an independent labor policy:

> The record shows that, after the Union began picketing, Todaro and Bauman [Terminal's president] conferred and agreed on a course of procedure vis-a-vis the Union which depended upon the effect of the picketing on the Terminal business * * *. This was agreement on a common labor policy * * *. I think it was largely dictated by Bauman * * *. [H]e outlined and controlled the strategy * * *. Although Todaro testified that he was still willing to sign up with the Union, but had not done so because he did not have enough cleaning work to make it feasible, I am satisfied that the "feasibility" of that step was controlled largely by Terminal's decision whether it would be willing to adjust Todaro's contract to take care of the added expense of operating under a union contract.

■ Arrangements of the type here disclosed must be scrutinized by the Board with great care, because of the danger that they may be used by the real parties in interest as a device to achieve insulation from union activity. In Seafarers International Union, etc. v. National Labor Relations Board, 105 U.S. App.D.C. 211, 265 F.2d 585 (1959), we described the breadth of the considerations which underlie the application of § 8(b) (4) and pointed out that that provision "must be interpreted and not merely read literally." And in Local No. 24, Inter. Bro. of Teamsters, etc. v. National Labor Relations Board, 105 U.S. App.D.C. 271, 276, 266 F.2d 675, 680 (1959), where we dealt specifically with § 8(b) (4) (B), we said:

> "Of course, in an area so wide as is the field of labor relations, there are many situations in which the answer to a dispute under [8(b) (4) (B)] is easily derived by the application of such legalistic formulae as 'independent contractors', 'co-employers', or 'allies'. But it is equally clear that there is a zone of dispute in which such formulae are useless, and the answer must be derived by applying the intent of the statute to the facts in the case."

The inquiry in the present case was limited to whether Todaro was an "independent contractor." We think it clear, however, that Todaro's relationship to Terminal was in the "zone of dispute in which such formulae are useless" and that "applying the intent of the statute to the facts in the case" required consideration of such facts as, for example, the history of Todaro's relationship to Terminal; the conduct of his cleaning business and its relation to Terminal's business; and Terminal's influence on, if not control over, Todaro's labor policy. In our view, these facts make inescapable the conclusion that Terminal was not a neutral within the meaning of the statute. The order of the Board must there-

fore be set aside and the petition for enforcement denied.[4]

So ordered.

WILBUR K. MILLER, Circuit Judge, dissents.

---

4. The Union challenges the Board's action in relying on the 1960 gross volume of business at all six Terminal shops to satisfy its self-imposed jurisdictional standard for retail enterprises of $500,-000 gross volume of business per annum. Carolina Supplies & Cement Co., 122 NLRB 88 (1958). The Union argues that the Board's statement in McAllister Transfer, 110 NLRB 1769, 1771–72 (1954), that it "will take into consideration * * * the operations of any secondary employers to the extent that the latter are affected by the conduct involved," limits computation of the jurisdictional amount to the gross volume of business of only the two Terminal shops actually picketed. We cannot say that the Board was arbitrary in including, for purposes of jurisdictional amount, the gross volume of the four shops not picketed, on the theory that they were "affected" by the dispute in that they were at least potentially if not directly involved. Cf. National Labor Relations Board v. Pease Oil Company, 279 F.2d 135 (2d Cir., 1960).