467 F.2d 392
 80 L.R.R.M. (BNA) 3254, 151 U.S.App.D.C. 338,
69 Lab.Cas. P 12,910
 CARPET, LINOLEUM, SOFT TILE AND RESILIENT FLOOR COVERING
LAYERS, LOCAL UNION NO. 419, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Sears, Roebuck and Company, Intervenor.
 No. 71-1320.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 19, 1972.
Decided July 28, 1972.
 
 Mr. David S. Barr, Washington, D. C., with whom Mr. Philip Hornbein, Jr., Denver, Colo., was on the brief, for petitioner.
 Mr. Baruch A. Fellner, Atty., N. L. R. B., with whom Messrs. Dominick L. Manoli, Associate Gen. Counsel, and Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., were on the brief, for respondent.
 Mr. Kalvin M. Grove, Chicago, Ill., for intervenor.
 Mr. Harry L. Browne, Kansas City, Mo., filed a brief on behalf of the American Retail Federation, as amicus curiae urging affirmance. Mr. James R. Willard, Kansas City, Mo., also entered an appearance for the American Retail Federation, as amicus curiae.
 Before FAHY, Senior Circuit Judge, and ROBINSON and MacKINNON, Circuit Judges.
 MacKINNON, Circuit Judge:
 
 
 1
 In June of 1969, the National Labor Relations Board (Board or Labor Board) issued a Decision and Order against Carpet, Linoleum, Soft Tile and Resilient Floor Covering Layers, Local 419, AFL-CIO (hereinafter referred to as the Union), finding that the Union had violated section 8(b)(4)(i) and (ii)(B) of the National Labor Relations Act, as amended (N.L.R.A.),[1] by engaging in a secondary boycott against Sears, Roebuck and Company (hereafter, Sears) in the Denver, Colorado, area.[2] The Union petitioned this court for review of the Labor Board's order, and the Board cross-applied for enforcement thereof against the Union. We affirmed the Board's factual determinations and its conclusion that the floor covering installers in question are "independent contractors," but remanded the case to the Labor Board "for a re-examination of the question of Sears' neutrality" for section 8(b)(4)(B) purposes.[3] In our written opinion, we suggested the possibility that "the relationship between Sears and the installers might so resemble that of employer and employee that a labor dispute with the installers could justifiably include Sears."[4]
 
 
 2
 *****
 
 
 3
 * * *
 
 
 4
 *****
 
 
 5
 * * *
 
 
 6
 Upon remand, in accordance with this court's instructions, and following the submission of briefs from all interested parties and the holding of oral argument, the Labor Board reconsidered its prior decision, and in April of 1971, it issued a Supplemental Decision in which it reaffirmed its original determination and order.[5] Thereafter, the Union petitioned this court for review of the Board's Supplemental Decision and Order, and the Labor Board cross-applied for enforcement thereof. We hereby deny the Union's appeal and enforce the Board's Supplemental Order in full.
 
 
 7
 * A. CONGRESSIONAL PURPOSE IN PROHIBITING SECONDARY BOYCOTTS
 
 
 8
 The prohibition against secondary boycotts, set forth in section 8(b)(4)(B) of the N.L.R.A., was originally enacted in 1947 as one of the Taft-Hartley amendments to the National Labor Relations Act,[6] and "must be construed in light of [its underlying] congressional purpose, which [was] 'to confine labor conflicts to the employer in whose labor relations the conflict had arisen, and to wall off the pressures generated by that conflict from unallied employers.' Miami Newspaper Pressmen's Local No. 46 v. NLRB, 116 U.S.App.D.C. 192, 197, 322 F.2d 405, 410 (1963)."[7] Section 8(b)(4)(B) evidences "the dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own."[8] This goal was made quite explicit in the legislative history which surrounded the enactment of this section in 1947.
 
 
 9
 B. LEGISLATIVE HISTORY.
 
 
 10
 In 1947, Congress was very desirous of protecting secondary employers from labor disputes with which they were not directly concerned.[9] This was due in large part to the fact that "[m]ore often than not the [secondary] employers are powerless to comply with demands giving rise to the [secondary] activities, and many times they and their employees as well are the helpless victims of quarrels that do not concern them at all." H.Rep.No.245, 80th Cong., 1st Sess. 23 (1947), in I Legislative History at 314. Although such secondary parties had previously been protected under the common law conspiracy doctrines, Congress believed that recent court decisions had eroded much of this protection and it wished to reestablish the traditional principles. To accomplish this desired result, Congress enacted a broad provision which prohibited all secondary boycott activity.
 
 
 11
 Courts are beginning to turn from the practice of considering secondary boycotts in terms of common law conspiracy doctrine, and are determining the legality of particular factual situations on the basis of tort doctrine. On this basis there is a growing acceptance of certain forms of action directed against parties who are not immediately involved in a labor dispute when (1) such parties are found to possess "unity of interest" with the disputing employer, and (2) such action is found to be necessary in order to promote the legitimate interests of the labor union.
 
 
 12
 This bill [will] reverse that trend. * * * This bill ignores * * *distinctions between justified and unjustified boycotts based on the objectives of the union in carrying on such a boycott and the relationship of the boycotted employer to the disputing employer. It indiscriminately bans all such boycotts * * *[10]
 
 
 13
 Under the secondary boycott provision enacted by Congress, the Senate Report stated that "it would not be lawful for a union to engage in a strike against employer A for the purpose of forcing that employer to cease doing business with employer B; nor would it be lawful for a union to boycott employer A because employer A uses or otherwise deals in the goods of or does business with employer B (with whom the union has a dispute)." S.Rep.No.105, 80th Cong., 1st Sess. 22 (1947), in I Legislative History at 428. See H.Conf.Rep.No.510, 80th Cong., 1st Sess. 43 (1947), in I Legislative History at 547, 1947 U.S.Code Cong.Serv., p. 1135.[11] Thus employer A, as a "secondary" employer, would be entitled to the protection of the N.L.R.A.'s secondary boycott provision.
 
 
 14
 With the above-mentioned congressional objectives and legislative history in mind, it becomes necessary to determine whether Sears is a true "secondary" employer which has the right to the Act's protection from secondary boycotts under section 8(b)(4)(B), or a "primary" employer which does not.[12]
 
 
 15
 C. INDEPENDENCE AS EVIDENCE OF "SECONDARY" STATUS.
 
 
 16
 A secondary boycott involves union pressure directed at a "secondary" party, where an objective[13] is to induce or coerce it to cease doing business with the "primary" employer or person,[14] with whom the union is engaged in a labor dispute. See National Woodwork Manufacturers Association v. N. L. R. B., 386 U.S. 612, 622 & n.8, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967). Although this definition of secondary boycott appears on the surface to be quite straight-forward, it is deceptive. As important as the distinction between legitimate "primary" activity and proscribed "secondary" activity is, "it does not present a glaringly bright line." Local 761, International Union of Electrical, Radio and Machine Workers v. N. L. R. B., 366 U.S. 667, 673, 81 S.Ct. 1285, 1289, 6 L.Ed.2d 592 (1961). While "there are many situations in which the answer to a dispute under [section 8(b)(4)(B)] is easily derived by the application of such legalistic formulae as 'independent contractors', 'coemployers', or 'allies' * * * it is * * * clear that there is a zone of dispute in which such formulae are useless, and the answer must be derived by applying the intent of the statute to the facts in the case." Local No. 24, International Brotherhood of Teamsters etc. v. N. L. R. B., 105 U.S.App.D.C. 271, 276, 266 F.2d 675, 680 (1959). See Building Service Employees International Union, Local 32-J v. N. L. R. B., 114 U.S.App.D.C. 199, 202, 313 F.2d 880, 883 (1963). Where, as in the instant case, the economic interrelationship between the parties is of such complexity that the exclusive reliance upon glib formulae or pat phrases would be improper, it is apparent that the Labor Board may not base a determination of "secondary" employer status wholly upon the finding of an independent contractor relationship. See Local No. 24, International Brotherhood of Teamsters etc. v. N. L. R. B., supra, 105 U.S.App.D.C. at 276, 266 F.2d at 680; Building Service Employees International Union, Local 32-J v. N. L. R. B., supra, 114 U.S.App.D.C. at 202, 313 F.2d at 883; Local 282, International Brotherhood of Teamsters, 155 NLRB 973, 989 (1965).[15] However, this does not mean that such an independent contractor determination may not be of significance with respect to the resolution of the section 8(b) (4) (B) question.
 
 
 17
 The finding of an independent contractor relationship, while not always conclusive, is nevertheless of great importance in determining the issue of "secondary"/"primary" status under section 8(b) (4) (B), if for no other reason than the fact that the factors on which the independent contractor finding rests demonstrate that one party does not exercise control over the other in significant respects.[16] It therefore follows that such a determination may well indicate that one party does not exert such influence over the employment policies of the other, that a union's labor dispute with one of the independently contracting parties should be permitted to legally involve the other party, through means prohibited by section 8(b) (4) (B). Support for this conclusion that an independent contractor relationship is not to be generally regarded as analogous to a "primary" "employer"-"employee" relationship finds strong support in the 1947 congressional action.
 
 
 18
 In N. L. R. B. v. Hearst Publications, Inc., 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944), decided three years before the Taft-Hartley amendments, the Supreme Court agreed with the Labor Board's extremely expansive interpretation of the statutory definition of the term "employee," as it affirmed the Board's decision that independent newsboys were "employees" who were entitled to N.L.R.A. coverage. The Court approved of the Board's rejection of the application of the traditional common law standards and its adoption of a novel economic and policy considerations approach. See 322 U.S. at 128-129, 64 S.Ct. 851. However, in 1947, Congress amended the Act so as to expressly overrule the principles upon which the Hearst decision was based.
 
 
 19
 This result was accomplished by the Taft-Hartley amendments to the National Labor Relations Act which amended the statutory definition of "employee" to expressly exclude "any individual having the status of an independent contractor."[17] This alteration in the law was intended to make it clear that Congress only contemplated the ordinary meaning of the term "employee" in the Act, and the legislative history unambiguously indicates that this change was intended to overrule the broad meaning that the Hearst Publications economic and policy considerations analysis gave to the term "employee." See H.Rep.No.245, 80th Cong., 1st Sess. 18 (1947), in I Legislative History at 309; H.Conf.Rep.No.510, 80th Cong., 1st Sess. 32-33 (1947), in I Legislative History at 536-537; II Legislative History at 1537 (comments of Senator Taft). See also Boire v. Greyhound Corp., 376 U.S. 473, 481 & n.10, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964); N. L. R. B. v. United Insurance Co., 390 U.S. 254, 256, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968).[18]
 
 
 20
 The congressional rejection of the decision in Hearst has significant implication with respect to secondary boycott cases. It demonstrates a clear intention on the part of Congress to require the utilization of traditional concepts and common sense when applying and interpreting the relevant statutory provisions. It further indicates that the mere fact that the relationship between two parties involves some economic interdependence is not sufficient in and of itself to cause one of the parties to lose its "secondary" status, for section 8(b) (4) (B) purposes, vis-a-vis the other party. This conclusion is dictated by the very nature of secondary boycotts. It is intuitively obvious that a union which is engaged in a labor dispute with one party will not endeavor to enlist the support of another party, unless there is some relationship present, direct or indirect, between the two parties. This most frequently involves an economic relationship. Without the presence of some interrelationship between the two parties, it would be an exercise in futility for the union to seek the aid of the second party, since it would necessarily have no possible means of providing meaningful support for the union. It is therefore logically apparent that something more than mere economic interdependence between two parties is required before one loses its "secondary" status with respect to the labor disputes of the other.[19]
 
 
 21
 This reasoning has been well recognized by both Labor Board and court decision. For example, it has been held that corporate entities of the same parent corporation are separate persons, each entitled to the secondary boycott protection of the N.L.R.A. concerning the labor disputes of the other, in the absence of some common control or special entanglement which justifies widening a dispute beyond its initial limits to involve the other corporate entity. See American Federation of Television and Radio Artists, Washington-Baltimore Local v. N. L. R. B., 149 U.S.App.D.C. 272, 462 F.2d 887 (Decided April 17, 1972); Los Angeles Newspaper Guild, Local 69, 185 NLRB No. 25, 1970 CCH NLRB p 22,255 (1970), aff'd., 443 F.2d 1173 (9th Cir. 1971); N. L. R. B. v. General Teamster, Warehouse and Dairy Employees, Local No. 126, 435 F.2d 288 (7th Cir. 1970). Yet it is readily apparent that such related corporate entities are at least somewhat economically interrelated.
 
 
 22
 Although the mere finding of an independent contractor relationship might not be sufficient in some cases to establish the requisite "secondary" status of the parties vis-a-vis each other, for section 8(b) (4) (B) purposes, it is clear that the mere presence of some economic interdependence between the two will not automatically cause one to lose its secondary boycott protection with respect to the labor disputes of the other.[20] The appropriate result must necessarily depend upon the particular facts of each case.
 
 II
 
 23
 As we have noted, it is sometimes very difficult to delineate between lawful "primary" activity and unlawful "secondary" activity.[21] Nevertheless, "[h]owever difficult the drawing of lines more nice than obvious, the statute compels the task," Local 761, International Union of Electrical, Radio and Machine Workers v. N. L. R. B., 366 U.S. 667, 674, 81 S.Ct. 1285, 1290, 6 L.Ed.2d 592 (1961), and it is principally the function of the Labor Board, as the agency established by Congress and entrusted with the major task of interpreting and applying the N.L.R.A.,[22] to make the required determination in a particular case. See N. L. R. B. v. Hearst Publications, Inc., 322 U.S. 111, 130, 64 S.Ct. 851, 88 L.Ed. 1170 (1944); Gray v. Powell, 314 U.S. 402, 411, 62 S.Ct. 326, 86 L.Ed. 301 (1941).
 
 
 24
 Since Congress has committed the primary adjudicatory function under the Act to the Labor Board, as the expert body created by it to resolve such issues as we are herein concerned with, our review function is a limited one. "We are not to overturn the Board's findings and conclusions * * * if they are based upon substantial evidence in the record as a whole and have 'a reasonable basis in law."' Miami Newspaper Pressmen's Local No. 46 v. N. L. R. B., 116 U.S.App.D.C. 192, 196, 322 F.2d 405, 409 (1963). See N. L. R. B. v. Hearst Publications, Inc., 322 U.S. 111, 131, 64 S.Ct. 851, 88 L.Ed. 1170 (1944). See also Joint Council of Teamsters No. 42 v. N. L. R. B., 146 U.S.App.D.C. 275, 279, 450 F.2d 1322, 1326 (1971).[23]
 
 III
 
 25
 A. THE SUPPLEMENTAL DECISION OF THE LABOR BOARD.
 
 
 26
 1. The Labor Board's Findings.
 
 
 27
 The Labor Board provided a complete summary of the relevant facts in its Supplemental Decision:
 
 
 28
 The details of the relationship between Sears and the installers have been set forth at considerable length in the Trial Examiner's Decision,[24] in the Board's previous Decision,[25] and in the court's Decision[26] as well. In summary, the installers perform no work at Sears' locations beyond picking up carpet and installation orders; operate out of their own homes; utilize their own trucks, tools, and equipment; hire their own employees, where necessary, at rates of pay which are not determined by Sears; are responsible for repair or [sic] damage which may be caused during installation; establish their own hours and schedules; schedule and reschedule jobs directly with the customers without notice to Sears; subcontract jobs without prior approval or knowledge of Sears; in practice do extra work for customers without Sears' approval; generally perform work without instructions or guidelines; and, if a job is more difficult or time consuming then estimated by Sears, change the prices quoted by Sears to the customer. In addition we note the following circumstances established by the evidence before us. The installers here work for firms other than Sears who sell installed carpet and at least to that extent are in competition with Sears; the installers can and do turn down work for Sears;[27] and there are no employees of Sears performing functions which are the same as or similar to those of the installers.[28]
 
 
 29
 The Board then proceeded to succinctly set forth its conclusions of law:
 
 
 30
 While we accept the view of the [remanding] court, we are convinced that this case falls within the ambit of Denver Building and Construction Trades Council.[29] It is unquestionably true, as the court suggest[ed], that Sears has a competitive interest in the amounts charged by the installers for their services, and that Sears is thus concerned with whether those installers join a labor organization, insofar as such circumstances might affect the fees charged by the installers. However, * * * we do not believe that such an economic interest requires a conclusion that a firm is not neutral for the purposes of Section 8(b) (4) (i) (ii) (B) where, as here, the record so clearly shows the independent contractor status of the installers,[30] and the manner in which they secure and perform their work for Sears; the absence of Sears' employees doing the same work;[31] the fact that the installers can and do turn down work offered by Sears; and the fact that they work for other companies.[32]
 
 
 31
 For the reasons set out below, we affirm the Labor Board's Supplemental Decision and enforce its Order in full.
 
 
 32
 2. The Law of the Case.
 
 
 33
 Morand Brothers Beverage Co. v. N. L. R. B., 204 F.2d 529 (7th Cir. 1953), cert. denied, 346 U.S. 909, 74 S.Ct. 241, 98 L.Ed. 407 (1953), rehg. denied, 346 U.S. 940, 74 S.Ct. 376, 98 L.Ed. 428 (1954), summarized a doctrine which is always relevant to cases which appear in the posture of the case before us:
 
 
 34
 The position of any administrative tribunal whose hearings, findings, conclusions and orders are subject to direct judicial review, is much akin to that of a United States District Court. Federal Communications Commission v. Pottsville Broadcasting Co., 309 U.S. 134, 140, 60 S.Ct. 437, 84 L.Ed. 656. That is to say, it is the "inferior" tribunal, whose decisions, both substantive and, in some instances, adjective, are subject to review and consequent approval or disapproval by the reviewing body. The full implication of this relationship is realized when, as here, the occasion [has arisen] for the reviewing court to state what it believes to be the substantive law applicable to a particular controversy but [has found] that the lower tribunal has not conclusively found the facts to which this law should be applied. The result then, in view of the rule that a reviewing court shall not enter initial findings of fact, [was] an order remanding the cause "for further proceedings in conformity with the decision of this court." The pronouncements of the reviewing court are then known in the vernacular as "the law of the case", i. e., they are the rules to govern the particular dispute at hand, unless, of course, the decision of the reviewing court [has been] declared erroneous by a tribunal of competent jurisdiction holding a still more superior position in the judicial pyramid. In such a situation it behooves the inferior arbiter to exercise great care that "the law of the case" is applied to the facts of the case when they have been precisely determined by it. This is so even when it finds itself in well founded disagreement with its reviewer.[33]
 
 
 35
 "When the case was directed to be remanded to the [Labor Board] for such further proceedings as might be appropriate, it was with the thought that the [Board] would give full effect to its duties in harmony with the views we had expressed." S. E. C. v. Chenery Corp., 332 U.S. 194, 200, 67 S.Ct. 1575, 1579, 91 L.Ed. 1995 (1947). See F. C. C. v. Pottsville Broadcasting Co., 309 U.S. 134, 145, 60 S.Ct. 437, 84 L.Ed. 656 (1940). However, we did not in any way mean to foreclose the Labor Board "from enforcing the legislative policy of the act it administers, provided the new order does not conflict with [our previous] mandate." F. T. C. v. Colgate-Palmolive Co., 380 U.S. 374, 379, 85 S.Ct. 1035, 1039, 13 L.Ed.2d 904 (1965). In this regard, it is imperative that we recognize the full import of our prior decision.
 
 
 36
 In our previous opinion in this case, we indicated the necessity for reconsideration by the Labor Board of its determination of Sears' "secondary" status, due to the fact that it had apparently relied exclusively upon the finding of an independent contractor relationship in factual circumstances of extreme economic complexity. See Carpet, Linoleum, Soft Tile and Resilient Floor Covering Layers, Local Union No. 419 v. N. L. R. B., 139 U.S.App.D.C. 68, 70-72, 429 F.2d 747, 749-751 (1970). It is clear that the Labor Board was therefore foreclosed upon remand from placing controlling reliance upon the independent contractor status of the installers. However, this was the only "law of the case" enunciated by us which was wholly binding on the Board.
 
 
 37
 Although our previous opinion discussed various factors which we believed might be worthy of consideration by the Labor Board on remand,[34] in such instances we clearly did not intend to bind the Board. They were merely suggested as possible aids to the Board, and we did not contemplate that their mention would derogate from the broad adjudicatory discretion which we recognized the Labor Board would have a statutory obligation to exercise on remand. Thus, contrary to the assertion of the Union, the Board was clearly not under a binding duty to evaluate and consider each and every one of the factors suggested by us. So long as the Board's reconsideration did not place controlling weight on the independent contractor relationship, and has appropriate factual support in the record as a whole and an adequate basis in law, the Board's opinion is entitled to be accepted by us.[35]3. The Rationale of the Labor Board Decision on Remand.
 
 
 38
 In its Supplemental Decision, the Labor Board did not rely exclusively upon the independent contractor status of the installers as it reaffirmed its prior section 8(b) (4) (i) and (ii) (B) determinations. Although the Board emphasized the independent contractor relationship between Sears and the installers, it also emphasized (1) the manner in which the installers independently secure and perform their contracted work for Sears; (2) that no Sears' employees perform the same or similar floor covering installation work; (3) that the independent installers can and do turn down work offered by Sears; and (4) that the installers work for other companies which may be in direct competition with Sears. See Carpet, Linoleum, Soft Tile and Resilient Floor Covering Layers, Local Union No. 419, AFL-CIO, 190 NLRB No. 28, 1971 CCH NLRB p 22,984 (1971), slip op. at 5-6. We find that the findings of the Board in its Supplemental Decision have substantial support in the record considered as a whole,[36] and have sufficient basis in law and policy to warrant acceptance by us.
 
 
 39
 In our previous decision, we indicated that a situation might arise where the continuing economic interrelationship between parties having an independent contractor relationship with one another might be so inextricably intertwined that one might reasonably be considered to be related to the other in a "primary," rather than a "secondary," fashion for secondary boycott purposes.[37] Carpet, Linoleum, Soft Tile and Resilient Floor Covering Layers, Local Union No. 419 v. N.L.R.B., 139 U.S.App.D.C. 68, 73-75, 429 F.2d 747, 752-754 (1970). See Local No. 24 International Brotherhood of Teamsters, etc. v. N.L.R.B., 105 U.S.App.D.C. 271, 266 F.2d 675 (1959). However, while the relationship between Sears and the independent floor covering installers might be considered to be more integrated and economically interrelated than the relationships which generally exist between a retailer and/or manufacturer and those who contract to perform required services for it, due to the fact that the installers perform a very important service for Sears' customers-i. e., they install the floor covering purchased from Sears[38]-we find that the Board reasonably concluded on remand that the relationship is not such that Sears should be held to have lost its "secondary" status for section 8(b) (4) (B) purposes.
 
 
 40
 The independent contractor/installers exercise extremely broad discretion concerning the manner in which they perform work for Sears, and as set forth above, in actual practice they occasionally turn down work offered by Sears. Furthermore, they can and do perform work for competitors of Sears. Therefore, if they were ever dissatisfied with the relationship between themselves and Sears, they could, on appropriate written notice, terminate it entirely, if they preferred to work exclusively for other companies, or, as a practical matter, they could alter their business arrangements in such a manner that they would perform less work for Sears and more work for other parties. Under these circumstances, it is clear, as the Board recognized in its Supplemental Decision, that the separate instances of Sears control over the independent operations of the installers are not so pervasive,[39] nor is the economic interdependence such, that Sears should be regarded as a "primary," rather than a "secondary," party with respect to a labor dispute between the Union and the installers. See International Brotherhood of Electrical Workers, Local 501 v. N.L.R.B., 181 F.2d 34, 37 (2nd Cir. 1950), affd., 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299 (1951); N.L.R.B. v. Wine, Liquor and Distillery Workers Union, etc., 178 F.2d 584, 587 (2nd Cir. 1949).
 
 
 41
 In the instant case, the "primary" labor dispute concerns the Union and the independent contractor/installers. The Union would like to force the installers to become Union members, and it wants to require them to negotiate more lucrative installation contracts so that they will not undercut established Union standards that are alleged to exist. Since the character of the dispute between the Union and the installers is such that Sears could meaningfully accede to all of the Union's demands only by ceasing to do business with the installers, it is apparent that the Union's coercive action toward Sears has been violative of section 8(b) (4) (i) and (ii) (B) of the Act.
 
 
 42
 B. OTHER UNION ARGUMENTS.
 
 
 43
 The Union makes several misconceived arguments which warrant brief discussion. It asserts that Sears plays such a dominant role in the determination of the compensation received by the installers and has such an interest in their economic affairs that the Union should have the right to demand collective bargaining with Sears concerning the installers. However, since the statutory term "employee" expressly excludes "any individual having the status of an independent contractor,"[40] and an employer is only under the statutory obligation to negotiate with the chosen representative of its own "employees",[41] it is clear that Sears was and is under no statutory obligation to negotiate with the Union over the installers, who are "independent contractors."[42]
 
 
 44
 The Union erroneously relies upon Carpet, Linoleum, and Soft Tile Layers, Local No. 1238 (Arnold's Carpet), 175 NLRB 332 (1969), and Local No. 2265, United Brotherhood of Carpenters and Joiners of America, AFL-CIO (Carpet Center), 170 NLRB 633 (1968). In those cases, unlike the instant one, "employer"-"employee" relationships, rather than "independent contractor" relationships, were found, thereby rendering the employers concerned "primary" parties. However, in its original decision in the case at bar, the Labor Board appropriately distinguished the Arnold's Carpet and Carpet Center decisions, on the ground that those cases clearly evidenced far more indicia of control by the employers over the persons performing the installation work than does the instant case with respect to Sears. See Carpet, Linoleum, Soft Tile and Resilient Floor Covering Layers, Local Union No. 419, AFL-CIO, 176 NLRB No. 120, 1969 CCH NLRB p 20,964 (1964), slip op. at 2-3 & n.3. Because of these differences concerning the amounts of exercised control, it was therefore completely logical and consistent for the Board to have determined that the installers in the present case are "independent contractors," while those in Arnold's Carpet and Carpet Center were "employees," thereby rendering those decisions inapposite to the Sears-installers situation.[43]
 
 
 45
 The Union also contends that the economic interrelationship between Sears and the independent contractor/installers is sufficiently intertwined that Sears should not be provided with secondary boycott protection under section 8(b) (4) (B), with respect to the labor dispute between the Union and the installers. We however, must reject this assertion.
 
 
 46
 The Union's economic and policy arguments closely resemble those which were accepted by the Supreme Court in N.L.R.B. v. Hearst Publications, Inc., 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944), but were later expressly overruled by Congress in 1947, mandating a return to the traditional, common law analysis.[44] The ramifications of this unmistaken congressional attitude for secondary boycott purposes has been recognized in two important decisions.
 
 
 47
 In International Brotherhood of Electrical Workers, Local 501 v. N.L.R.B., 181 F.2d 34 (2nd Cir. 1950), a Second Circuit majority rejected the arguments of dissenting Judge Clark, who favored the utilization of the Hearst approach to secondary boycott cases, and its decision, which followed the traditional approach, was affirmed by the Supreme Court. International Brotherhood of Electrical Workers v. N.L.R.B., 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299 (1951). The Supreme Court reaffirmed its compelled rejection of its earlier Hearst approach to secondary boycott situations in N.L.R.B. v. Denver Building and Construction Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951). In light of these unambiguous Supreme Court pronouncements, it would clearly not be appropriate for this court to accept the Union's arguments which would lead us back to the congressionally rejected Hearst approach.
 
 IV
 
 48
 The type of situation with which we are herein concerned was expressly discussed on the Senate floor by Senator Taft in 1947:
 
 
 49
 Take a case in which the employer is getting along perfectly with his employees. * * * Someone else says to those employees, "We want you to strike against your employer because he happens to be handling some product which we do not like [or is doing business with someone we do not approve of]. * * * Of course if that sort of thing is encouraged there will be hundreds and thousands of strikes in the United States. There is no reason that I can see why we should make it lawful for persons to incite workers to strike when they are perfectly satisfied with their conditions. * * * The Senator [Mr. Pepper] says they must be encouraged to strike because their employer happens to be doing business with someone the union does not like or with whom it is having trouble or having a strike. On that basis there can be a chain reaction that will tie up the entire United States * * *
 
 
 50
 II Legislative History at 1107. Since the position of Senator Taft, rather than that of Senator Pepper, prevailed, as evidenced by the enactment of the pervasive anti-secondary boycott section by Congress,[45] it is apparent that the decision of the Labor Board on remand must be affirmed.[46]
 
 
 51
 The Union's petition for review is denied, and enforcement of the Labor Board's order, as reaffirmed in its Supplemental Decision and Order, is hereby granted in full.
 
 
 52
 Judgment accordingly.
 
 FAHY, Senior Circuit Judge:
 
 53
 I concur in the result reached in the carefully considered opinion of Judge MacKinnon, but since I do not feel so clearly as to the result I briefly state separately my position. Were the initial decision of the case for me to make I think it likely I would agree with the dissenting views of Board Member Fanning. My doubts about the Board's decision are indicated in the opinion of this court when the case was here the first time. But my views are not such as to justify me now in not deferring to the conclusion reached by the Board in its reconsideration following our remand.
 
 
 
 [1]
 29 U.S.C. Sec. 158(b)(4)(B) (1970) provides:
 (b) It shall be an unfair labor practice for a labor organization or its agents-
 (4) (i) to engage in, or to induce or encourage an individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is-
 (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing; [emphasis supplied]
 
 
 [2]
 Carpet, Linoleum, Soft Tile and Resilient Floor Covering Layers, Local Union No. 419, AFL-CIO, 176 NLRB No. 120, 1969 CCH NLRB p 20,964 (1969). The unfair labor practice charge which precipitated this order grew out of the Union's picketing of Sears, Roebuck and Company in the Denver, Colorado area, allegedly "with an unlawful object of forcing Sears to cease doing business with" certain installers of floor covering
 
 
 [3]
 Carpet, Linoleum, Soft Tile and Resilient Floor Covering Layers, Local Union No. 419 v. N.L.R.B., 139 U.S.App.D.C. 68, 429 F.2d 747 (1970)
 
 
 [4]
 Id., 139 U.S.App.D.C. at 75, 429 F.2d at 754. Pending the Labor Board's reconsideration of the issue of Sears' "neutrality," we granted enforcement of the Board's existing order
 
 
 [5]
 Carpet, Linoleum, Soft Tile and Resilient Floor Covering Layers, Local Union No. 419, AFL-CIO, 190 NLRB No. 28, 1971 CCH NLRB p 22,984 (1971)
 
 
 [6]
 See 61 Stat. 141. It was then denominated section 8(b)(4)(A). Under the Landrum-Griffin Act amendments to the National Labor Relations Act in 1959, 73 Stat. 542, section 8(b)(4)(A) of the Act became section 8(b)(4)(B). See National Woodwork Manufacturers Association v. N.L.R.B., 386 U.S. 612, 614, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967)
 
 
 [7]
 American Federation of Television and Radio Artists, Washington-Baltimore Local v. N.L.R.B., 149 U.S.App.D.C. 272, 275, 462 F.2d 887, 890 (Decided April 17, 1972)
 
 
 [8]
 N.L.R.B. v. Denver Building and Construction Trades Council, 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284 (1951). See American Federation of Television and Radio Artists, Washington-Baltimore Local v. N.L.R.B., 149 U.S.App.D.C. 272, 275, 462 F.2d 887, 890 (Decided April 17, 1972); Local 761, International Union of Electrical, Radio and Machine Workers v. N.L.R.B., 366 U.S. 667, 672, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961); Houston Insulation Contractors Association v. N.L.R.B., 386 U.S. 664, 668, 87 S.Ct. 1278, 18 L.Ed.2d 389 (1967)
 
 
 [9]
 "Secondary boycotts engaged in by labor unions to force a third party, not a party to a primary labor dispute, to force that party to cease using the products of the employer engaged in the primary dispute is an activity which should be made illegal." I Legislative History of the Labor Management Relations Act, 1947 (N.L.R.B. 1948) [hereinafter cited "Legislative History"] at 583 (comments of Represenative Landis). See II Legislative History at 1106-1107 (comments of Senator Taft)
 
 
 [10]
 II Legislative History at 1047-1048 (comments of Senator Murray) (emphasis supplied). See also II Legislative History at 1579 (analysis of Senator Murray). Although the statement of Senator Murray was made in opposition to the broad proscription against all secondary boycotts, it is completely consistent with the interpretation outlined in the remarks of Senator Taft, one of the bill's sponsors:
 The Senator [Mr. Pepper] will find a great many decisions * * * which hold that under the common law a seconary boycott [was] unlawful. Subsequently, under the provisions of the Norris-La Guardia Act, it became impossible to stop a secondary boycott * * * no matter how unlawful it may have been at common law. All this provision of the bill does is to reverse the effect of the law as to secondary boycotts. It has been set forth that there are good secondary boycotts and bad secondary boycotts. Our committee heard evidence for weeks and never succeeded in having anyone tell us the difference between different kinds of secondary boycotts. So we have so broadened the provision dealing with secondary boycotts as to make them [all] an unfair labor practice. [emphasis supplied]
 II Legislative History at 1106. See N.L.R.B. v. Denver Building and Construction Trades Council, 341 U.S. 675, 686, 71 S.Ct. 943, 95 L.Ed. 1284 (1951); National Woodwork Manufacturers Association v. N.L.R.B., 386 U.S. 612, 624, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967); N.L.R.B. v. Wine, Liquor and Distillery Workers Union, 178 F.2d 584, 586-587 (2nd Cir. 1949).
 
 
 [11]
 See N.L.R.B. v. Denver Building and Construction Trades Council, 341 U.S. 675, 686-687, 71 S.Ct. 943, 95 L.Ed. 1284 (1951); National Woodwork Manufacturers Association v. N.L.R.B., 386 U.S. 612, 625, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967)
 
 
 [12]
 The proviso to section 8(b)(4)(B), which expressly exempts "any primary strike or primary picketing" from the proscription of that section, makes it clear that a "primary" employer has no protection under 8(b)(4)(B). See National Woodwork Manufacturers Association v. N.L.R.B., 386 U.S. 612, 632 n. 20, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967). See also United Steelworkers of America v. N.L.R.B., 376 U.S. 492, 496, 84 S.Ct. 899, 11 L.Ed.2d 863 (1964). For complete text of section 8(b)(4)(B), see note 1, supra
 
 
 [13]
 It is sufficient to establish a violation of section 8(b) (4) (B) that an objective of the union's secondary action, although not necessarily the only objective, is to force the secondary employer to cease doing business with the primary party. See International Brotherhood of Electrical Workers v. N.L.R.B., 341 U.S. 694, 700, 71 S.Ct. 954, 95 L.Ed. 1299 (1951); N.L.R.B. v. Denver Building and Construction Trades Council, 341 U.S. 675, 689, 71 S.Ct. 943, 95 L.Ed. 1284 & n. 18 (1951)
 
 
 [14]
 Section 8(b) (4) (B) only speaks of "forcing or requiring any person to * * cease doing business with any other person * * *" (emphasis supplied). See note 1, supra. "Employer" status, within the meaning of section 2(2) of the Act, 29 U.S.C. Sec. 152(2) (1970), is not a sine qua non to the existence of a section 8(b) (4) (B) violation
 
 
 [15]
 It was the Labor Board's apparent undue reliance, in its original decision, upon the mere finding of "independent contractor" status with respect to the carpet installers with whom the Union had its primary labor dispute which precipitated our earlier remand of the instant case. See Carpet, Linoleum, Soft Tile and Resilient Floor Covering Layers, Local Union No. 419 v. N.L.R.B., 139 U.S.App.D.C. 68, 70-72, 429 F.2d 747, 749-751 (1970)
 
 
 [16]
 See Carpet, Linoleum, Soft Tile and Resilient Floor Covering Layers, Local Union No. 419, AFL-CIO, 176 NLRB No. 120, 1969 CCH NLRB p 20,964 (1969), T.X.D. slip op. at 18-22 and cases cited therein. See also Joint Council of Teamsters No. 42 v. N.L.R.B., 146 U.S.App.D.C. 275, 450 F.2d 1322 (1971); N.L.R.B. v. United Insurance Co., 390 U.S. 254, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968)
 
 
 [17]
 Act of June 23, 1947, ch. 120, title I, Sec. 101, 61 Stat. 137-138. See section 2(3) of the N.L.R.A., 29 U.S.C. Sec. 152(3) (1970), which provides: "The term 'employee' shall include any employee * * but shall not include * * * any individual having the status of an independent contractor * * *"
 
 
 [18]
 The House Report emphasized the fact that "[i]n the law, there always has been a difference, and a big difference, between 'employees' and 'independent contractors'." H.Rep.No.245, 80th Cong., 1st Sess. 18 (1947), in I Legislative History at 309
 
 
 [19]
 Any other interpretive analysis would render the protection provided parties by section 8(b) (4) (B) wholly nugatory, for if the mere presence of some economic interdependence between two separate parties were sufficient to cause one to lose its section 8(b) (4) (B) protection concerning the labor disputes of the other, not only would the language and intent of the secondary boycott provisions be emasculated, but it would be obvious that the provisions would no longer have meaningful application. They would only apply where a union seeks to enlist the aid of a party wholly unconcerned and unconnected with the party with whom the union has its dispute-a highly unlikely situation
 
 
 [20]
 We are of course cognizant of the established "ally" doctrine, under which a seemingly protected secondary party loses its secondary boycott protection by performing "struck work," thereby helping the primary employer to frustrate the effects of the union's strike. See, e. g., Douds v. Metropolitan Federation of Architects etc., 75 F.Supp. 672 (S.D.N.Y. 1948); N.L.R.B. v. Business Machine and Office Appliance Mechanics, etc., 228 F.2d 553 (2nd Cir. 1955), cert. denied, 351 U.S. 962, 76 S.Ct. 1025, 100 L.Ed. 1483 (1956). See also Truck Drivers Union Local No. 413 etc. v. N.L.R.B., 118 U.S.App.D.C. 149, 156-157, 334 F.2d 539, 546-547, cert. denied, 379 U.S. 916, 85 S.Ct. 264, 13 L.Ed.2d 186 (1964); National Woodwork Manufacturers Association v. N.L.R.B., 386 U.S. 612, 627, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967). However, since Sears employs no employees who perform floor covering installation work, it is clear, as the Labor Board has determined, that the "ally" doctrine has no application to the factual circumstances of the instant case
 
 
 [21]
 See Local 761, International Union of Electrical, Radio and Machine Workers v. N.L.R.B., 366 U.S. 667, 673, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961)
 
 
 [22]
 "One of the purposes which lead to the creation of such boards is to have decisions based upon evidential facts under the particular statute made by experienced officials with an adequate appreciation of the complexities of the subject which is entrusted to their administration." Republic Aviation Corp. v. N.L.R.B., 324 U.S. 793, 800, 65 S.Ct. 982, 986, 89 L.Ed. 1372 (1945)
 
 
 [23]
 "Not only are the findings of the Board conclusive with respect to questions of fact in this field when supported by substantial evidence on the record as a whole, but the Board's interpretation of the Act and the Board's application of it in doubtful situations are entitled to weight." N.L.R.B. v. Denver Building and Construction Trades Council, 341 U.S. 675, 691-692, 71 S.Ct. 943, 953, 95 L.Ed. 1284 (1951). See N.L.R.B. v. United Insurance Co., 390 U.S. 254, 260, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968)
 
 
 [24]
 See Carpet, Linoleum, Soft Tile and Resilient Floor Covering Layers, Local Union No. 419, AFL-CIO, 176 NLRB No. 120, 1969 CCH NLRB p 20,964 (1969), T.X.D. slip op. at 4-18
 
 
 [25]
 See Carpet, Linoleum, Soft Tile and Resilient Floor Covering Layers, Local Union No. 419, AFL-CIO, 176 NLRB No. 120, 1969 CCH NLRB p 20,964 (1969), slip. op. at 2-3
 
 
 [26]
 See Carpet, Linoleum, Soft Tile and Resilient Floor Covering Layers, Local Union No. 419 v. N.L.R.B., 139 U.S.App.D.C. 68, 69-70, 429 F.2d 747, 748-749 (1970)
 
 
 [27]
 The opposite contention of the Union is based upon a construction of the terms of the contracts between Sears and the various installers, but the actual practices of the parties are, as found by the Labor Board, to the contrary, i. e., the installers do reject tendered assignments. See Carpet, Linoleum, Soft Tile and Resilient Floor Covering Layers, Local Union No. 419, AFL-CIO, 190 NLRB No. 28, 1971 CCH NLRB p 22,984 (1971), slip op. at 6 n.5
 
 
 [28]
 Carpet, Linoleum, Soft Tile and Resilient Floor Covering Layers, Local Union No. 419, AFL-CIO, 190 NLRB No. 28, 1971 CCH NLRB p 22,984 (1971), slip op. at 4-5
 
 
 [29]
 N.L.R.B. v. Denver Building and Construction Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951)
 
 
 [30]
 In our previous decision, we accepted the Labor Board's determination that the installers with whom Sears deals are "independent contractors." See Carpet, Linoleum, Soft Tile and Resilient Floor Covering Layers, Local Union No. 419 v. N.L.R.B., 139 U.S.App.D.C. 68, 70, 429 F.2d 747, 749 (1970). There is no reason to re-examine that finding here
 
 
 [31]
 Due to the fact that employees of Sears do not perform any floor covering installation work, it is apparent that the established "ally" doctrine is not applicable to the instant case. See note 20, supra
 
 
 [32]
 Carpet, Linoleum, Soft Tile and Resilient Floor Covering Layers, Local Union No. 419, AFL-CIO, 190 NLRB No. 28, 1971 CCH NLRB p 22,984 (1971), slip op. at 5-6 (emphasis supplied)
 
 
 [33]
 204 F.2d at 532
 
 
 [34]
 See Carpet, Linoleum, Soft Tile and Resilient Floor Covering Layers, Local Union No. 419 v. N.L.R.B., 139 U.S.App.D.C. 68, 72-74, 429 F.2d 747, 751-753 (1970)
 
 
 [35]
 See Part II of this opinion, supra
 
 
 [36]
 See section 10(e) and (f) of the N.L.R.A., 29 U.S.C. Sec. 160(e) & (f) (1970). See also Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951)
 
 
 [37]
 Such a continuing interrelationship would, of course, be different from the temporary type of relationship which would normally cause the traditional "ally" doctrine to become applicable. See note 20, supra, and cases cited therein
 
 
 [38]
 We recognize that other independent contractor relationships involving retailers and/or manufacturers, whereby other parties contract to perform vital services for them-e. g., maintenance or janitorial work-might be closely analogous to the Sears-installers relationship. However, this fact strongly supports our present decision to affirm the Labor Board's Supplemental Decision, since it is readily apparent from the legislative history and congressional objectives surrounding the enactment of the N.L.R.A.'s secondary boycott provisions [see Parts I(A) and (B) of this opinion, supra], as well as from the congressional rejection of the Hearst economic and policy considerations approach [see Part I(C), supra], that such relationships were ordinarily intended to be considered "secondary" for section 8(b) (4) (B) puposes
 
 
 [39]
 Cf. Local No. 24, International Brotherhood of Teamsters etc. v. N.L.R.B., 105 U.S.App.D.C. 271, 276, 266 F.2d 675, 680 (1959)
 
 
 [40]
 See section 2(3) of the Act, 29 U.S.C. Sec. 152(3) (1970), which is set out in note 17, supra
 
 
 [41]
 Section 8(a)(5) of the Act, 29 U.S.C. Sec. 158(a)(5) (1970), makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees, * * *" (emphasis supplied) See, e. g., Allied Chemical and Alkali Workers of America, Local Union No. 1 v. Pittsburgh Plate Glass Co., Chemical Division, 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971)
 
 
 [42]
 See note 30, supra. The Union's reliance upon Local 24, of International Brotherhood of Teamsters etc. v. Oliver, 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed.2d 312 (1959), is misplaced, for that federal pre-emption case only concerned the duty of an employer to negotiate with the bargaining representative of its own employees regarding the leasing rates to be paid by it to independent contractor/"gypsy" truck drivers who were in direct competition with the employer's own employee/drivers, who were represented by the union in question. Sears, on the other hand, has no statutory employees, whom the Union could represent, who perform any floor covering installation work. The Union's reliance upon American Federation of Musicians v. Carroll, 391 U.S. 99, 88 S.Ct. 1562, 20 L.Ed.2d 460 (1968), is similarly misplaced, since that decision only concerned the scope of labor's exemption from the federal antitrust laws
 
 
 [43]
 We similarly believe that the rationale of our decision in Local No. 24, International Brotherhood of Teamsters etc. v. N.L.R.B., 105 U.S.App.D.C. 271, 266 F.2d 675 (1959), is inapplicable to the present situation. In that case, the motor carrier being picketed by the union extensively participated in the employment relationship between the striking drivers and their lessor-owner/employers, thereby rendering the carrier ineligible for secondary boycott protection. Sears is clearly not so involved with its contract installers. The two cases are therefore distinguishable on the amount of control exercised
 
 
 [44]
 See discussion in Part I(C) of this opinion, supra
 
 
 [45]
 See discussion in Part I(B) of this opinion, supra
 
 
 [46]
 That portion of the Labor Board's decision in Local 282, International Brotherhood of Teamsters, 155 NLRB 973 (1965), upon which the Union relies, is clearly distinguishable from the case at bar, since the dispute in that case was directly between the union in question and those employers against which it directed its economic pressure. Here, on the other hand, the dispute is primarily between the Union and the independent contractor/installers, with Sears being only a "secondary" party thereto. Furthermore, in the situations referred to by the Union in the Local 282 case, the employers which were the objects of the collective activity controlled the "manner and means" of job performance to a far greater extent than does Sears with respect to the installers with whom we are herein concerned. See 155 NLRB at 988-990